[No. S011206. July 1, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE HATTON SMITHEY, Defendant and Appellant.

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, R. Brewster Thompson, Mary McComb, Kate Johnston, Jay Colangelo, Donald Bull and Albert W. Brodie, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Stan Cross and Janet E. Neeley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, C. J.**—Following the guilt phase of the trial, a jury found defendant George Hatton Smithey guilty of one count of first degree murder (Pen. Code, §§ 187, 189),[1] first degree robbery (§§ 211, 212.5), attempted rape (§§ 261, former subd. (2),[2] 664), and first degree burglary (§§ 459, former 460.1).[3] The jury found true the allegation that defendant used a deadly weapon (a knife) during the commission of these crimes. (§§ 12022, subd. (b), 12022.3, subd. (a).) The jury also found true three special-circumstance allegations—that the murder was committed while defendant was engaged in the commission of a robbery, the attempted commission of a rape, and the commission of a burglary. (§ 190.2, former subd. (a)(17)(i), (iii) & (vii).)[4] Following the penalty phase of the trial, the jury returned a verdict imposing a sentence of death.

This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) We affirm the judgment in its entirety.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] Now section 261, subdivision (a)(2).
[3] Now section 460, subdivision (a).
[4] Now section 190.2, subdivision (a)(17)(A), (C), and (G).

# I. Facts

## A. *Guilt Phase Evidence*

### 1. *The Prosecution Case*

The murder victim, Cheryl Nesler, lived in a trailer in Glencoe, California, with her six-year-old daughter, Rachel, and her four-year-old son, Ross. Her husband, Mark Nesler, had been in jail since January 1988. There was evidence she was in possession of cash at the time of the offense: Wayne Bunnell drove Cheryl to cash a welfare check on or around April 5, 1988. Cheryl also had cashed a welfare check at Laverne Fischer's store, a short distance from Cheryl's trailer, on or before March 15. During the first week of April, Fischer gave Cheryl smaller denominations in exchange for a $100 bill.

At approximately 4:00 p.m. on April 8, defendant asked to buy some methamphetamine from his friend Linda Esposito-Swetts (Swetts), but she said she had none to sell. Defendant argued with Swetts regarding $200 he owed her. Defendant offered her approximately $44 as partial payment, but Swetts told defendant that if he did not have all her money, she did not want any of it. Defendant then left, stating: "I'll be back with the rest of your money." He was known always to carry a large pocketknife, which on this occasion was lying open on the front seat of his automobile, a yellow and white Dodge.

At approximately 4:30 p.m. on that day, Renee Blondeau drove for approximately four miles behind a yellow automobile with a white top. The driver was male and was driving erratically. Blondeau observed the vehicle stop near the driveway to Cheryl's home.

Cheryl's daughter Rachel observed defendant drive his vehicle up to their trailer. Cheryl came outside and talked with defendant as he sat in the vehicle. At some point, defendant exited from the automobile with a knife in his hand and went into the trailer with Cheryl. Rachel went inside and saw defendant and Cheryl in Rachel's bedroom. Cheryl was on the bed with her feet on the floor, and defendant was on top of Cheryl. Defendant told Rachel to leave. After defendant left the Nesler property, Rachel went into her bedroom and observed her mother with blood on her neck.

At approximately 5:15 p.m., Rachel came running toward Linda Contreras's beauty shop, next door to Fischer's store, and said: "A man had a knife and he killed my mama." Contreras called 911 and reported this

information, as well as Rachel's description of the perpetrator's yellow and white automobile that was headed in the direction of Mokelumne Hill, eight to ten miles away. A deputy sheriff arrived at the Nesler home at approximately 5:30 p.m. and found Cheryl Nesler dead, lying on her back on a bed, with her feet on the floor and throat slit. An autopsy indicated that death was caused by three knife wounds to the neck, causing loss of blood, aspiration of blood into the airway, and interruption of blood supply to the brain. The knife cut through the carotid artery, jugular veins, larynx, and muscles of the neck.

On his way to Glencoe to investigate the reported homicide, Deputy Sheriff William Nuttall spotted defendant's vehicle in a parking lot in Mokelumne Hill. Nuttall asked defendant for identification, and as defendant pulled a wallet from his rear pocket, a bloodstained $1 bill fell out of the same pocket. Nuttall also observed a bloody knife on the front seat. Approximately $70 and a towel consistent with others observed in Cheryl's bathroom later were seized from defendant's vehicle.

Nuttall arrested defendant. After being advised of and waiving his constitutional rights, defendant told Deputy Sheriff Randy Grasmuck that he had visited someone in Rail Road Flat, gone to the Glencoe store to buy some beer, picked up a hitchhiker, and drove to Mokelumne Hill. When asked about the knife on the front seat of his vehicle, defendant stated that he did not own a knife and did not know of any knife in his vehicle. Defendant further denied knowing Cheryl or Mark Nesler or being at Cheryl's home. Grasmuck could smell alcohol on defendant's breath or person, but defendant's speech was not slurred and Grasmuck noticed nothing in his demeanor to indicate that defendant was intoxicated.

Deputy Sheriff Norman Varain drove Rachel and Fischer to Mokelumne Hill to determine whether they could identify the suspect or his vehicle. Rachel identified defendant's vehicle as the one that had been at her house, and defendant as the man who killed her mother. Fischer recognized defendant as the man who had purchased beer at her store approximately 30 minutes before Rachel reported her mother's death.

Varain returned to Glencoe to investigate the crime scene. He found a wallet lying on top of the bedspread under Cheryl's left arm next to her body. The wallet contained some loose change but no paper money. Two identification cards and a business card in the wallet had bloodstains on them. Varain also found a $20 bill on the floor underneath a chair in the kitchen area. Draped across the back of a chair was a leather purse with the flap open; the only money in the purse was loose change. No other money was in the trailer.

A variety of forensic evidence linked defendant to the crime. Tire tracks in Cheryl's driveway matched a tire on defendant's automobile. The driveway gate appeared to have been rammed with a vehicle; the hinges were off and the bottom boards were broken. One board appeared to have been run over by a vehicle, and scrapes on the board matched marks on the underside of defendant's automobile. Blood on the knife seized from defendant's automobile was consistent with genetic markers in Cheryl's blood and could have been contributed by one in ninety individuals. Bloodstains on a $20 bill used by defendant to buy beer in Mokelumne Hill, the $1 bill that fell from his pocket, the cards from Cheryl's wallet, and a cigarette butt found outside Cheryl's trailer all contained genetic markers consistent with Cheryl's. Semen stains on Cheryl's shirt and on defendant's shirt were of the same genetic type as defendant's. Another stain on defendant's shirt contained genetic types that were the same as Cheryl's, but foreign to defendant.

### 2. The Defense Case

Defendant testified on his own behalf as follows. The day before Cheryl's death, defendant worked on his automobile all day and through the night. He injected methamphetamine three times and drank beer. When morning came, defendant went to visit someone who owed him money for a set of trailer axles and steel cable, and was paid $170. Defendant later used methamphetamine with Bunnell, and then with defendant's friend Betty Jo Allee. Around noon, defendant decided to find Swetts. He was upset because he and Swetts were very close friends, but they had been arguing because defendant owed Swetts money. When he encountered Swetts, she offered to obtain some methamphetamine so that defendant could sell it and pay Swetts the money he owed her. Defendant then injected methamphetamine he obtained from Swetts. Later that day, he tried to buy more methamphetamine from her, but she refused. Defendant offered to pay Swetts the money he owed, but she did not come to his automobile to get it.

Allee testified that she noticed "quite a few" rolled up bills stuffed beside the ashtray in defendant's automobile. When Swetts refused to sell him drugs, defendant was upset and was drinking wine. Allee and defendant met at her house a short time later, where defendant was distraught and crying. On cross-examination, Allee stated that before defendant left, he told her that he was going to get some money.

Defendant further testified that he decided to go to Cheryl's home that afternoon to explain why he had been unable to take Cheryl to visit her husband, Mark, in jail, as defendant had promised. While Mark was gone, defendant had helped Cheryl with chores and fixed her water line. He also

had engaged in sexual relations with her on two previous occasions. That day, however, defendant was not thinking about having sex with Cheryl or obtaining money from her.

When defendant arrived, Cheryl invited him into the trailer. Defendant's knife was in his back pocket, and he did not remember having it in his hand when he went inside. Defendant recalled sitting with Cheryl on a bed, talking about Mark's court case. Defendant had his arm on her shoulder. The next thing defendant remembered was standing over Cheryl, shaking her and asking her whether she was okay. Defendant saw blood all over her neck and could not get her to answer. Defendant's knife was in his right hand; there was blood on the blade. Cheryl was not moving and appeared to be dead. Her pants were halfway down. Defendant was fully clothed. Defendant then walked out of the trailer with the open knife still in his hand. He knew Cheryl was dead but did not know why. Defendant admitted killing Cheryl, because he "was the only one who could have done it standing over there with blood on [him]." Defendant, however, did not remember killing her, looking through her wallet for money, or attempting to have sexual relations with her. He denied intending to steal anything from Cheryl or taking any money from her.

As he was leaving Cheryl's driveway, defendant heard something strike the automobile and did not realize what it was, but evidently it was the gate. The bloody knife was on the front seat of the vehicle. Approximately one-half mile from the driveway, defendant's automobile broke down, and he pulled off the road. When defendant left Cheryl's trailer, he intended to get help. By the time his automobile broke down, however, he did not remember that he had killed Cheryl. There was "something bugging" defendant, but he did not know what it was. After he repaired his vehicle, a man walked up and asked for a ride to Mokelumne Hill. Defendant dropped the man off before reaching the parking lot where defendant was arrested. Only when an officer detained him did defendant begin to recall that Cheryl was dead. Defendant remembered telling an officer that he did not own a knife, which defendant admitted was untrue, but did not recall other questions asked by the officer.

Three defense experts testified regarding defendant's mental deficits. Tests indicated defendant had organic brain damage, generally diffuse brain dysfunction, and mild mental retardation. Chronic users of methamphetamine such as defendant may experience impaired judgment, loss of emotional control, and memory impairment. Based upon police reports, a toxicology analysis of defendant's blood, and the testimony at trial, ample evidence indicated defendant was suffering from classic amphetamine psychosis syndrome. Defendant also had amnesia for certain periods of time on

the day of the homicide. His mental disorders caused him to be totally out of control. Absent these disorders he would not have committed this particular crime.

### 3. *Rebuttal*

Psychiatrist Lee Stuart Coleman expressed his opinion that psychiatrists do not have tools that are better than those of a layperson to determine a person's state of mind at the time of a crime. He disagreed with the various opinions and diagnoses of the defense experts, because he believed the tests they used in assessing defendant's mental condition were unreliable. There was no evidence that defendant was psychotic, because nothing suggested he had delusions, hallucinations, or other irrational thinking or behavior. If a person is incapacitated by drugs, disease, or mental disorder, he or she will not be capable of apparently intentional acts. Medical evidence indicates that apparently intentional acts are in fact intentional.

## B. *Penalty Phase Evidence*

### 1. *The Prosecution Case*

In 1966, defendant's wife, who was estranged from him at the time, refused to go to California with defendant. He removed a gun from the glove compartment of his automobile and fired a shot past his wife into the door. She began screaming, and defendant fired his weapon once or twice into the dashboard, telling her that if she did not go with him, he would kill her.

Defendant was arrested in 1968 for robbery. When apprehended, he was carrying a concealed, loaded revolver. Defendant was convicted of armed robbery and sentenced to a 60-year prison term. He escaped from prison in April 1973, and while at large, committed an armed robbery of a tavern.

### 2. *The Defense Case*

An associate warden and a captain at state prisons in Tennessee testified regarding defendant's behavior while he was incarcerated for his 1968 robbery conviction. In early April 1973, defendant was one of approximately ten inmates who escaped by cutting through a cellblock roof, making a rope ladder, and going over the wall. There was no harm or injury to prison personnel, and defendant was apprehended within two months. Defendant otherwise was a good inmate, although he had some disciplinary infractions, including possession of a prison-made knife and wine. Neither infraction was uncommon for inmates at the prison; the knife was made "more or less

for [defendant's] own defense." Defendant never showed any aggressive behavior toward any of the other inmates. He was assigned to a plumbing and electrical maintenance crew and worked hard. He seemed a bit slow intellectually, but his mental deficiencies did not interfere with his ability to do maintenance work. From 1983 until he was paroled in 1987, defendant had no disciplinary problems. He did not participate in a riot that virtually destroyed the prison in 1985, but rather locked himself in his own cell. Defendant could relate well to both inmates and prison staff. He constantly was busy and worked on crafts, such as building items from wood and working on watches. Defendant would make a good "lifer," because inmates with life terms have more to lose than others if they do not follow the rules.

Defendant's family worked as sharecroppers and lived in small, old houses without basic amenities such as electricity and plumbing. His mother had epilepsy and was hospitalized for approximately one year shortly after defendant was born. When defendant was four or five years of age, he was required to do farm work. Often the family had little or no food. Defendant was a slow learner; when he was 13 years of age, a psychological evaluation indicated that his mental age at that time was 7 years. The psychologist's records indicated that defendant was mentally retarded due to an uncertain cause, possibly brain injury. Defendant's parents neglected and emotionally abused their children, and were physically violent with the children and with one another. Defendant's father consumed alcohol to excess and often was jailed for alcohol-related offenses.

When defendant was released from prison in April 1987, he began working with his brother and sister-in-law in their woodcutting business. Defendant wrecked two of their trucks, and was intoxicated at the time of one of the accidents. Defendant's parole officer sent him to the county mental health department to fulfill his parole condition that he participate in a mental health program. He was not seen by a mental health professional, however, because the parole officer did not release certain papers required by the health department. Defendant's parole was transferred to California in August 1987. His California parole officer had no contact with Tennessee officials regarding the mental health program condition of parole, and no knowledge of any steps taken in California to comply with it. Approximately one week before the murder, defendant tested positive for methamphetamine.

A clinical psychologist reiterated information previously conveyed by defense experts and defendant's sisters regarding defendant's mental condition and background. She also testified that when defendant was between the ages of 16 and 22 years, he worked as a peddler selling fruit. He stayed in abandoned buildings and often was intoxicated. Defendant was married at

the age of 22 years and fathered a child. He worked in a lumberyard and sawmill, and sometimes in the oil fields, and he and his wife managed to purchase a house. On the other hand, he was drinking heavily, abusing his wife, and taking drugs. Defendant met several criteria suggesting a greater likelihood that an individual might commit a murder. His low intelligence and exposure to violence in prison also played a role in the present offense. When defendant was in prison, he had no need to exercise good judgment, because all decisions were made for him, so he did not learn any coping skills there. In light of defendant's poor functioning in society before he went to prison, his escape and commission of a robbery, and his abuse of drugs, defendant would need external controls to adjust to civilian life. The decision to allow him to reside with his brother (and former crime partner) in an unfamiliar setting was predictably a disastrous situation.

Defendant testified that the victim, Cheryl Nesler, was a good person, and he expressed sorrow regarding what had happened. He did not go to the Nesler home with the intention of harming Cheryl. Defendant would take her place to bring her back if he could. Cheryl did not deserve to be killed and did nothing to contribute to what happened to her.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Claim of Prosecutorial Misconduct in Examining a Defense Expert*

Section 28, subdivision (a), provides that evidence of mental disease, defect, or disorder is not admissible "to show or negate the *capacity* to form any mental state," but is admissible solely on the issue whether the accused "*actually* formed a required specific intent . . . when a specific intent crime is charged." (Italics added.) Section 29 also limits the admissibility of evidence of a defendant's mental state: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

Defendant contends that the prosecutor violated the restrictions imposed by these statutes when, during cross-examination of defendant's psychiatric expert, and over repeated defense objections, the prosecutor persistently asked the expert questions concerning whether defendant could form or did form the intent to commit the crimes with which he was charged. These statutory violations, defendant maintains, amounted to prejudicial misconduct that denied him the right to a fair trial guaranteed by the Sixth and Fourteenth Amendments.

As mentioned previously, the defense elicited testimony that defendant was suffering from organic brain damage, mental retardation, and paranoid psychosis at the time of the homicide. These mental disorders, according to defense expert Robert M. Bittle, M.D., impaired defendant's judgment and memory and prevented him from responding appropriately to surrounding events and understanding what was occurring around him. In Dr. Bittle's opinion, defendant would not have committed the crimes if he had not suffered from these mental disorders.

During cross-examination, the prosecutor asked whether Dr. Bittle found it suspicious that the only things defendant had not admitted were the relevant mental states at issue in this case. Dr. Bittle responded in part: "I can't testify as to specific mental states at that time, as you well know." The following exchange ensued:

"[Prosecutor]: "So you don't have an opinion, then whether or not he could form the intent to commit the crimes that he is charged with?

"[Defense counsel]: Your Honor, I am going to have to object because this is getting into an area that the law doesn't allow him to give an opinion one way or the other, so he certainly can't comment. If he wants to have the question answered and open the door in this regard, that is fine, but I have to object.

"[Prosecutor]: I don't mind having the door opened in this regard, Your Honor.

"[Defense counsel]: Well, it is just improper questioning that Dr. Bittle and I have discussed that the law doesn't allow questioning in this area, so he is not prepared to testify in this area. And I object, it is not allowed by law.

"[Prosecutor]: Well, Counsel's correct, but I have no objection to opening the door to see whether or not the doctor has an opinion in [sic] the ultimate issue in the case."

After defense counsel indicated that a one-week continuance would be required to prepare for testimony regarding the issue, the prosecutor responded that he did not want to belabor the point and would move on. Subsequently, the prosecutor asked Dr. Bittle whether he had an opinion regarding how defendant "would be able to cause that type of injury with a knife if he didn't intend to do it," and how defendant would be able to unfasten Cheryl's pants and pull them down "if he didn't intend to do that."

Defense counsel again objected on the ground that the law did not allow the witness to testify regarding intent, and the prosecutor asked a different question. The prosecutor later referred to testimony that defendant had told several individuals that he was going to go up the hill and return with some money, and asked Dr. Bittle whether "[t]he fact that he did go up the hill, and the fact that it appears as though he did rob the victim, does that indicate that his judgment was impaired?" Dr. Bittle responded, "He might have some intent to rob, based upon that statement."

After Dr. Bittle and the jury were excused, defendant moved for a mistrial on the ground that the prosecutor was aware of the proscriptions of sections 28 and 29, but decided to continue to violate them until he finally elicited an answer regarding defendant's intent to rob. Defendant contended that the jury would understand from the prosecutor's questions and the defense objections that the defense did not want Dr. Bittle to answer, because he would have testified that defendant did have the requisite intent to commit the crimes. The court denied the motion and admonished the jury to disregard the questions and answers regarding defendant's intent.

█ "The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.]" (*People* v. *Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].) "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Ibid.*)

"It is, of course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.' [Citations.]" (*People* v. *Bonin* (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217], overruled on another point in *People* v. *Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Such misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected. (*People* v. *Bell* (1989) 49 Cal.3d 502, 532 [262 Cal.Rptr. 1, 778 P.2d 129].) An expert witness may not be cross-examined regarding matters that are not relevant to the expert's opinion or qualifications. (*Ibid.*; see Evid. Code, § 721, subd. (a).) As we have seen, an expert may not offer an opinion regarding whether

the defendant had the capacity to form the intent required for the crime, or whether the defendant actually did form the requisite intent. (*People* v. *Samayoa, supra,* 15 Cal.4th at pp. 835-837.)

■ The prosecutor's question seeking to elicit Dr. Bittle's inadmissible opinion regarding defendant's capacity to form such intent at the time he committed the crimes, and the prosecutor's subsequent remarks that he was willing to "open the door" on that issue, were improper. Even if an experienced prosecutor legitimately could believe that the parties may waive the prohibitions in section 28 and 29, a showing of bad faith or knowledge of the wrongfulness of his or her conduct is not required to establish prosecutorial misconduct. (*People* v. *Hill, supra,* 17 Cal.4th 800, 822-823 & fn. 1.) On the other hand, the prosecutor's questions concerning how defendant could perform certain acts without intending to do them, and whether defendant's actions indicated that he had impaired judgment, were not inappropriate. Defendant concedes that the prosecutor legitimately could attempt to show intent by emphasizing defendant's acts, and that his cross-examination in this regard was not "technically objectionable." Dr. Bittle's statement that defendant "might have had some intent to rob" was not responsive to the prosecutor's question concerning whether defendant's actions indicated that defendant's judgment was impaired, as Dr. Bittle previously had testified.

The prosecutor's improper question and remarks regarding capacity did not amount to an egregious pattern of conduct that rendered the trial fundamentally unfair in denial of defendant's federal constitutional right to due process of law. (*People* v. *Samayoa, supra,* 15 Cal.4th at p. 841.) Assuming the prosecutor's conduct constituted a deceptive or reprehensible method to persuade the jury, in violation of state law, such misconduct was not prejudicial. The prosecutor's improper question "constituted an isolated instance in a lengthy and otherwise well-conducted trial . . . ." (*People* v. *Bonin, supra,* 46 Cal.3d at p. 690.) As described in more detail below, the trial court quickly admonished the jury to disregard questions posed to Dr. Bittle regarding defendant's intent to commit the crime and any answers to such questions, explained that any objections to such questions were proper, and read the text of section 29. Furthermore, at the conclusion of the guilt phase, the trial court instructed the jury: "If an objection was sustained to a question, do not guess what the answer might have been. Do not speculate as to the reason for the objection. [¶] Do not assume to be true any insinuation suggested by a question asked a witness." We presume the jury followed the court's detailed instructions regarding this matter and conclude that, in light of the instructions, there is no reasonable likelihood the jury was misled by the prosecutor's improper question. (*People* v. *Mayfield* (1993) 5 Cal.4th 142, 179 [19 Cal.Rptr.2d 836, 852 P.2d 331].) Accordingly, no prejudice is shown.

In a related claim, defendant contends the prosecutor's misconduct violated his Sixth Amendment right to confrontation, because the only way defendant could rebut the inference raised by the prosecutor's improper questions was to ask Dr. Bittle similar improper questions that would elicit inadmissible testimony. Defendant relies upon *Douglas* v. *Alabama* (1965) 380 U.S. 415, 416-420 [85 S.Ct. 1074, 1075-1078, 13 L.Ed.2d 934], in which the defendant's accomplice was called to testify at the defendant's trial. The prosecutor read portions of the accomplice's alleged confession, pausing periodically to inquire whether the accomplice had made the statements. The accomplice repeatedly invoked his privilege against self-incrimination and refused to answer. The high court held that the prosecutor's reading of the confession and the accomplice's refusal to answer may have been construed by the jury to be the equivalent of testimony establishing that the accomplice did make the confession and that his statements, some of which were prejudicial to the defendant, were true. Because defense counsel could not question any witness regarding the matters raised during the prosecutor's examination of the accomplice, the high court held that the defendant was denied his right to confront and cross-examine the accomplice.

*Douglas* is distinguishable from the present case. Dr. Bittle was available for cross-examination, and the prosecutor's improper question regarding defendant's intent could not reasonably have been construed by the jury to constitute testimony by Dr. Bittle. (See *Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 643, fn. 15 [94 S.Ct. 1868, 1871, 40 L.Ed.2d 431] [there is no deprivation of the right to confrontation when the prosecutor does not introduce statements made by persons unavailable for questioning at trial].) The doctor's testimony that defendant might have had the intent to rob, as we have seen, was volunteered and not responsive to the prosecutor's question. In any event, the jury was instructed to disregard all questions regarding defendant's intent and any answers that may have been given. Defendant was not denied his right to confrontation.

### 2. The Potentially Ambiguous Curative Instruction

Defendant contends that the trial court's admonition to the jury following his motion for mistrial was confusing and ambiguous, and that there is a reasonable likelihood that the jurors understood the instruction to mean they were to disregard *all* the expert testimony defendant introduced regarding his intent to commit the acts underlying the crimes. According to defendant, the instruction thus prevented the jury from considering evidence presented in his defense and lowered the prosecution's burden of proof, in violation of the Sixth and Fourteenth Amendments of the United States Constitution and corresponding provisions in the California Constitution.

Defense counsel's objections to the prosecutor's questions regarding intent came near the end of the prosecutor's cross-examination of Dr. Bittle. After a brief redirect examination, the trial court excused the jury to allow defendant to make his motion for a mistrial. When the jury returned a few minutes later, the trial court gave the following extemporaneous instruction: "Ladies and gentlemen, the Court wants to admonish the jury that they're to disregard questions that were given to the expert as to the intent of the defendant to commit the crime of the charge [*sic*] and to disregard any answers that may have been given to that question. Any objection [*sic*] made to such questions are proper objections under the law." The court read the text of section 29 and continued: "So there were some questions put to the expert asking him about whether or not the defendant may have had an intent to do this or that. I want you to disregard those questions and disregard any answers that may have been given, and also that the objections that were made to these questions were proper objections. So with that, you will follow my instructions, please."

Engaging in an elaborate parsing of this instruction, defendant contends that the jurors would not know which questions and answers they were to disregard and which objections were proper under the law. Furthermore, defendant continues, the language of section 29 read by the court referred to the testimony of "any expert," thus rendering the instruction equally applicable to the testimony of the other defense experts. In addition, section 29's statement that an expert shall not testify "as to whether the defendant had or did not have the required mental states," according to defendant, would cause lay jurors to believe that they could not consider expert testimony regarding *any* matters that might assist them in deciding whether defendant formed the required intent. Defendant also observes that the prosecutor's initial improper question violated section 28, not section 29, and thus nothing in the instruction informed the jurors that Dr. Bittle could not state his opinion regarding defendant's capacity to form the required mental state. Under the circumstances, and in light of Dr. Coleman's subsequent testimony that expert witnesses are no better equipped than laypersons to determine the defendant's mental state at the time he or she committed an act, defendant contends that the curative instruction essentially directed the jury to disregard all the important testimony of defendant's mental health experts.

■ If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. (*Estelle* v. *McGuire* (1991) 502 U.S. 62, 72 & fn. 4 [112 S.Ct. 475, 482, 116 L.Ed.2d 385]; *People* v. *Avena* (1996) 13 Cal.4th 394, 417 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' "

[Citations.]" (*People* v. *Musselwhite* (1998) 17 Cal.4th 1216, 1248 [74 Cal.Rptr.2d 212, 954 P.2d 475].)

■ We find no reasonable likelihood that the curative instruction could have been understood in the manner suggested by defendant. Although particular portions of the instruction potentially might have been confusing, taken as a whole and in context, the instruction adequately directed the jury to disregard the prosecutor's questions regarding Dr. Bittle's opinion as to defendant's intent to commit the crimes. The jury was aware from the attorneys' comments that the major point of contention during Dr. Bittle's testimony was the prosecutor's questioning regarding capacity and intent. The court's instruction was given only minutes after these comments were made. There is no reasonable likelihood that the instruction to disregard "questions that were given to the expert as to the intent of the defendant to commit the crime" and "any answers that may have been given" was interpreted by the jurors as indicating they properly could consider the question regarding capacity, nor is there a reasonable likelihood the jury construed the instruction as referring to all of Dr. Bittle's testimony or the testimony of other defense experts. Otherwise, there would have been no reason for the jury to hear several days of expert psychiatric and psychological testimony regarding defendant's mental state, for the court to instruct the jury that it could consider and weigh expert opinions in deciding questions in controversy at trial, or for both the prosecutor and defense counsel to refer during argument to the expert testimony regarding defendant's mental disorders and mental state.[5]

### 3. *Dr. Coleman's Testimony Regarding Forensic Psychiatry*

■ Defendant contends that Dr. Coleman's rebuttal testimony was inadmissible, and that its admission deprived him of his constitutional right to psychiatric assistance in preparing his defense, denied him the right to have the jury consider his defense, and usurped the court's role in determining the qualifications of expert witnesses and the reliability of scientific methods. Defendant further contends that his trial attorney's failure to object on these grounds constituted ineffective assistance of counsel, and that the prosecutor's presentation of this testimony constituted misconduct.

Dr. Coleman's testimony may be summarized as follows. Psychiatrists and other mental health professionals are no more qualified than a layperson to determine a defendant's mental state at the time he or she committed a crime, or to decide whether a defendant is psychotic. Such professionals

---

[5]In light of our conclusion, defendant's claim that the instruction precluded the jury from considering this evidence during the penalty phase as a mitigating circumstance also fails.

have no special skills for doing so, and the tools they use are far inferior to those that a layperson would use. The opinions of the defense experts were based upon tests that are unreliable, unscientific, and irrelevant, because, among other things, the examiner cannot ascertain whether someone performs poorly on a test simply because he or she is distracted, not interested, not trying, or malingering, and the results must be interpreted subjectively. The tests were not designed to be used in a forensic setting to ascertain a defendant's mental state at the time of a crime; moreover, they are not reliable even for what they were intended to accomplish. In determining whether defendant was psychotic when he killed Cheryl, the jurors first should realize that "psychotic" simply means crazy, irrational, or out of touch with reality. "[E]ither a person shows that they're acting and thinking crazy or they don't. There's nothing we [psychiatrists] can see below the face that lay persons couldn't see." The jurors should "not listen to any psychiatric labels or psychiatric reconstruction, but simply . . . look at the evidence, whatever evidence you get." The best way for the jurors to make sense of all the psychiatric testimony would be "to decide whether or not they think the methods are reliable, having heard the testimony of the other doctors, my testimony . . . . And then, based on that decision, give the testimony the weight they think it deserves. [¶] If the methods are not considered reliable, then obviously no doctor . . . can make . . . a silk purse out of a sow's ear, . . . and therefore it would deserve no weight if it was based on unreliable methods. And if they conclude otherwise, then again they have to give it the weight they think it deserves." On cross-examination, Dr. Coleman acknowledged that he believes using a psychiatrist to determine mental state in a forensic setting is "so flawed in its concept that it's completely worthless."

Defendant concedes that, although his trial counsel objected to certain portions of Dr. Coleman's testimony, counsel did not assert the grounds he presently raises or argue that Dr. Coleman's "generic attack on psychiatry" should have been excluded. Thus, defendant has waived the issue on appeal. (*People* v. *Danielson* (1992) 3 Cal.4th 691, 729 [13 Cal.Rptr.2d 1, 838 P.2d 729].) Because, however, defendant claims that such failure to object amounted to ineffective assistance of counsel, we consider his claim that this evidence was inadmissible in order to enable us to assess whether any alleged deficiency in counsel's performance prejudiced defendant. (*People* v. *Kipp* (1998) 18 Cal.4th 349, 366 [75 Cal.Rptr.2d 716, 956 P.2d 1169] ["If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient."].)

On several occasions we have considered testimony of Dr. Coleman that was virtually identical to that offered in this case, and in each instance we

rejected defense claims based upon such testimony. (*People* v. *Clark* (1993) 5 Cal.4th 950, 1019 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People* v. *Danielson, supra,* 3 Cal.4th at pp. 728-731; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 698-700 [248 Cal.Rptr. 69, 755 P.2d 253] [claim of prosecutorial misconduct arising from reliance upon Dr. Coleman's testimony]; see also *People* v. *Prince* (1988) 203 Cal.App.3d 848, 856-859 [250 Cal.Rptr. 154] [cited with approval in *Danielson*].) Although a defendant has the right to present a psychiatric defense through experts, and, as we have observed, the courtroom is not the proper forum to challenge the propriety of this process (*People* v. *Babbitt, supra,* 45 Cal.3d at p. 700), testimony such as Dr. Coleman's does not violate that right. As we determined in *People* v. *Danielson, supra,* 3 Cal.4th 691, Dr. Coleman's testimony regarding the unreliability of psychiatric testimony was neither improper nor prejudicial, because he did not suggest that courts should bar psychiatrists from the courtroom. Thus, his criticism of forensic psychiatry and of the opinions of the defense experts went to the weight of those opinions rather than their admissibility. (*Id.* at p. 730.) Moreover, because the trial court instructed the jury that an expert was entitled to state an opinion on a matter at issue in the trial, and that the jury was entitled to disregard an expert opinion if it was unreasonable, we have found such testimony by Dr. Coleman to be " 'clearly nonprejudicial.' " (*Id.* at p. 731, quoting *People* v. *Babbitt, supra,* 45 Cal.3d at p. 700.)

Defendant attempts to distinguish the foregoing decisions on the ground that in the present case Dr. Coleman characterized psychiatric testimony in a forensic setting as "completely worthless," and exhorted the jurors "not to listen to any psychiatric labels or psychiatric reconstruction"—essentially telling them to disregard the defense experts' psychiatric testimony altogether. Defendant contends that Dr. Coleman's testimony thus deprived him of his right to have psychiatric experts assist the jury in making the necessary mental state determinations. As in *People* v. *Danielson,* however, Dr. Coleman did not ask the jury completely to disregard psychiatric opinion. Although he expressed his own view that psychiatric methods are unreliable and offer no assistance in determining the mental state issues presented in the case, Dr. Coleman also stated that if the jury determined that those methods are reliable in light of all the psychiatric testimony, the jury must give the opinions of the defense experts whatever weight they deserve. This testimony, together with the court's instructions permitting the jurors to consider expert opinions with the reasons given for them, to give them the weight to which they are entitled, to disregard opinions they find to be unreasonable, and to resolve any conflict in the expert testimony by weighing the opinion of one expert against another, clearly indicated that it was the province of the jury to consider and weigh *all* the expert testimony. The

admission of Dr. Coleman's testimony thus was not improper or prejudicial. Therefore, defendant's claim of ineffective assistance of counsel fails, as does his claim that the prosecutor committed misconduct in eliciting the testimony.

Defendant further contends that Dr. Coleman's testimony circumvented the trial court's exclusive authority to determine the qualifications of experts and the admissibility of expert opinion based upon scientific methods. Defendant asserts that any challenge to the psychiatric testimony or to the reliability of the psychological tests used by his experts should have been raised in a *Kelly* hearing outside the presence of the jury. (*People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240] [admissibility of evidence produced by a new scientific technique requires a preliminary showing that it is reliable and generally accepted in the relevant scientific community, that the witness testifying regarding such reliability is properly qualified as an expert on the subject, and that correct scientific procedures complying with that technique were used in the particular case]; see *People* v. *Venegas* (1998) 18 Cal.4th 47, 76-81 [74 Cal.Rptr.2d 262, 954 P.2d 525].)

Neither the prosecutor nor Dr. Coleman, however, disputed the *admissibility* of the defense experts' opinions based upon the results of psychological testing. Rather, Dr. Coleman stated his opinion that psychological evaluations and testing are unreliable because the results must be interpreted subjectively and the expert has no means to determine whether extraneous causes, such as malingering, affect the results. This rebuttal testimony was not subject to *Kelly*'s requirements. As defendant acknowledges, California courts have accepted a qualified expert's decision to base his or her opinion regarding mental state upon standardized psychological tests such as those used by the defense experts in this case, and have not suggested that *Kelly* applies to expert opinions based upon such tests. (*People* v. *Stoll* (1989) 49 Cal.3d 1136, 1154, 1157-1158 [265 Cal.Rptr. 111, 783 P.2d 698].) Instead, "issues of test reliability and validity may be thoroughly explored on cross-examination at trial. (See [Evid. Code,] § 721, subd. (a).) *The prosecution also may call, in rebuttal, another expert of comparable background to challenge defense expert methods.* [Citation.]" (*People* v. *Stoll, supra,* 49 Cal.3d at p. 1159, italics added.) As an example of this procedure, our decision in *Stoll* cites *People* v. *Coleman* (1985) 38 Cal.3d 69, 79-80 [211 Cal.Rptr. 102, 695 P.2d 189], which describes rebuttal testimony by Dr. Coleman similar to that presented in this case. If expert opinion based upon psychological tests is admissible without first determining the reliability of those tests in a *Kelly* hearing, rebuttal expert opinion regarding reliability also must be admissible. (*People* v. *Stoll, supra,* 49 Cal.3d at pp. 1157-1159; see *People* v. *Clark, supra,* 5 Cal.4th at p. 1019 [Dr. Coleman was qualified

to give expert testimony regarding the unreliability of psychiatric testimony, which is a proper subject for expert opinion]; *People* v. *Prince, supra,* 203 Cal.App.3d at p. 858 [Dr. Coleman's testimony was relevant to the issues of weight and credibility of the expert opinions presented to the jury].)[6]

### 4. *Dr. Coleman's Testimony Regarding Intent*

■ In challenging another aspect of Dr. Coleman's testimony, defendant maintains that the doctor's opinions regarding intent were likely to mislead the jury into believing that if an individual performs a particular act, he or she necessarily intended to do so. Defendant points to Dr. Coleman's view that "you cannot create a human being who does things in which the behavior would seem to show a purpose behind this behavior, an intention; but in fact, the person doesn't really have this intention. . . . That is a fantasy, a myth. . . . [I]t does not happen from brain disease. It does not happen from drugs, it does not happen from mental disorders. . . . [¶] So if a person behaves in a way which would seem to show that they intended a certain thing, then medical evidence would indicate that was their intention because there's no other reason a person would do it unless they intended to do it."

According to defendant, this evidence was inconsistent with legal principles permitting defendants to rely upon mental state defenses. (E.g., *People* v. *Saille* (1991) 54 Cal.3d 1103, 1116-1117 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Moreover, defendant contends, the testimony created an unconstitutional presumption of intent. (*Sandstrom* v. *Montana* (1979) 442 U.S. 510, 520-524 [99 S.Ct. 2450, 2457-2459, 61 L.Ed.2d 39] [jury instruction creating a presumption that a person intends the ordinary consequences of his or her voluntary acts held unconstitutional].) Defendant claims that the prosecutor committed misconduct in eliciting this testimony, that defense counsel was incompetent for failing to object, and that the trial court shirked its obligation to limit or exclude the introduction of inadmissible evidence, rendering his trial fundamentally unfair.

Contrary to defendant's assertion, the testimony of one witness could not have created a legal presumption of intent, as did the improper jury instruction considered in *Sandstrom* v. *Montana, supra,* 442 U.S. 510. Furthermore, the court's instructions to the jury eliminated the possibility that Dr. Coleman's testimony would preclude the jurors from considering whether evidence of defendant's mental state showed that defendant did not have the

---

[6]Because we find that Dr. Coleman's testimony properly was admitted to rebut the opinions of the defense experts, we reject defendant's related claim that this testimony precluded an individualized penalty determination in violation of the Eighth Amendment to the United States Constitution.

requisite intent to commit the crimes. The trial court properly instructed the jury that for each crime charged, there must have existed "a union or joint operation of act or conduct *and* a certain specific intent in the mind of the perpetrator." (Italics added.) The jury also was told that it could consider evidence of mental disease, mental defect, mental disorder, and intoxication for the purpose of determining whether defendant actually formed the mental state that is an element of the crime charged.

A defendant may demonstrate that he or she did not form the intent required for a crime because of mental illness or voluntary intoxication, but may not exclude expert opinion evidence tending to demonstrate to the jury that such mental illness or intoxication did not prevent the defendant from forming the requisite intent. The extensive testimony of defendant's experts, and the trial court's instructions concerning expert testimony, intent, and mental disorder, persuade us that there is no reasonable likelihood the jury considered itself bound to accept Dr. Coleman's testimony regarding intent. This testimony did not raise an improper presumption of intent or render defendant's trial fundamentally unfair.

### 5. *Delores Gandara's Testimony*

After defendant left the victim's home, he stopped at a grocery store in Mokelumne Hill. The cashier, Delores Gandara, testified that she sold defendant a six-pack of beer and a baseball cap. Defendant wanted to buy Gandara a beer, and she replied that she was working and could not drink beer. Defendant then gave her a dollar, and she told him that she would buy herself a beer when she finished work. Defendant held Gandara's hand and said that he thought Gandara was "a pretty girl."

Pursuant to Evidence Code section 352, defendant moved to exclude as irrelevant and unduly prejudicial any testimony regarding defendant's holding Gandara's hand and telling her she was pretty. The prosecutor contended that the testimony was relevant to demonstrate defendant's state of mind around the time of the crime, and that his comments to Gandara were relevant to establish whether he was coherent and knew what he was doing. The court denied defendant's motion and stated: "I think the witness has a right to state everything that did take place . . . . [¶] . . . [I]t is not going into an area that is going to have an undue consumption of time or it isn't that highly prejudicial. It just shows what happened. And I think that she has a right to testify as to what happened at that precise time." In response to defense counsel's question whether the court was making a finding that the probative value outweighed the prejudicial effect of the evidence, the court responded: "Well, I don't find that the testimony would necessitate undue

consumption of time, nor create substantial danger of undue prejudice, or of confusing the issues, or of misleading the jury. [¶] It's something that took place at a time that [the prosecutor] has a right to show what the defendant did. . . ."

■ Defendant contends that the court erred, because the record does not show affirmatively that the court actually weighed prejudice against probative value; in particular, according to defendant, the court did not identify the probative value that it weighed against the potential for prejudice. As we have explained, however, "the court need make no express statements on these issues so long as the record affirmatively shows that weighing occurred, and there is an adequate basis for appellate review. [Citations.]" (*People* v. *Arias* (1996) 13 Cal.4th 92, 155 [51 Cal.Rptr.2d 770, 913 P.2d 980].) In finding that the prosecution had a right to "show what defendant did," and "what happened," the court implicitly accepted the prosecutor's contention that the evidence was relevant to prove defendant's state of mind at or around the time of the crime. The court also expressly stated that the evidence was not unduly prejudicial. The record demonstrates that the trial court adequately weighed the testimony's probative value against its potential for prejudice.

We further conclude that the trial court did not abuse its discretion in overruling defendant's objection pursuant to Evidence Code section 352. Defendant's actions and speech immediately following the crime were probative of his mental condition at the time of the crime, and also of his condition at a time when he claimed he was unable to remember that he had intended to seek help for Cheryl. Gandara's statement that defendant held her hand and told her that she was pretty described relatively innocuous conduct and did not carry an undue risk of prejudice.

Defendant contends that prejudice arose from the manner in which the prosecutor used the evidence. According to defendant, the prosecutor did not argue to the jury that this evidence was relevant to defendant's mental state, but rather used the testimony to portray defendant as a predator upon women and chronic womanizer, whose character flaw in this regard motivated the crime. Although during argument the prosecutor posed the rhetorical question, "[W]hat type of person are we dealing with here in George Hatton Smithey?," and then mentioned that defendant "flirted" with Gandara after "committing cold-blooded murder," taken in context this reference appears not to have been intended to demonstrate that defendant had a character flaw, but rather to impeach defendant's testimony that "something was bugging" him at the store because he had intended, but had forgotten, to get help for Cheryl. The circumstance that defendant held Gandara's hand and

told her she was pretty was not likely to have led the jury to believe that defendant was a predator upon women or more likely to commit violent crimes against women. The trial court did not abuse its discretion in determining that the probative value of this testimony outweighed any risk of prejudice.

6. *Testimony Regarding the Victim's Suspicion of Defendant's Prior Theft*

██ Wayne Bunnell testified during the prosecution's case-in-chief that he helped Cheryl with various tasks after her husband went to jail. On cross-examination, defense counsel asked Bunnell whether he once had helped Cheryl by repairing the gate to her driveway. Bunnell responded: "I patched the gate up so she could get it closed because she was pretty sure that somebody had been down there and stole a welder. And she told me she thought it was [defendant]. [¶] And I told her I wouldn't let anyone [in] there because somebody was slowly taking Mark [Nesler's] possessions. So when Mark was in jail, things were slowly missing on the property." On redirect examination, the prosecutor pursued this matter further, and Bunnell repeated his testimony that Cheryl believed defendant had stolen the welder. Defense counsel objected, contending that the testimony was irrelevant hearsay. The trial court overruled the objection on the ground that on cross-examination Bunnell already had mentioned the theft of the welder. In response to additional questions by the prosecutor, Bunnell testified that at the time Cheryl had informed him of the missing welder, Mark was in jail and defendant and Bunnell had been the only individuals with access to Mark's workshop around the time Cheryl noticed the welder was missing.

Defendant contends that the trial court erred in admitting this testimony on the theory that the subject of the missing welder was raised during cross-examination. He relies upon decisions concluding that a failure to object to improper questions or testimony on direct examination may not be used on cross-examination to elicit immaterial or irrelevant testimony. (E.g., *People v. McDaniel* (1943) 59 Cal.App.2d 672, 677 [140 P.2d 88].) Defendant further observes that Bunnell's initial comments regarding the welder were volunteered and nonresponsive to the question posed by defense counsel. Because the testimony did not damage the prosecution's case, defendant contends, the prosecutor should not have been allowed to pursue this line of questioning on redirect examination, the prosecutor having no need to impeach or rebut this evidence. Defendant claims that the testimony was irrelevant for any purpose other than to suggest his predisposition to steal from Cheryl, and that the trial court had a sua sponte duty either to strike the testimony and instruct the jury not to consider it, or to grant a mistrial.

Defendant further asserts that the admission of the testimony regarding Cheryl's belief deprived him of his federal and state constitutional rights to confrontation, due process of law, and a reliable death verdict.

The Attorney General concedes that the trial court should not have ruled the testimony admissible solely because defendant had "opened the door" during cross-examination. The evidence, however, was admissible for the nonhearsay purpose of showing Cheryl's state of mind concerning defendant. (Evid. Code, § 1250, subd. (a)(1); *People* v. *Jones* (1996) 13 Cal.4th 535, 548 [54 Cal.Rptr.2d 42, 917 P.2d 1165].) Indeed, the prosecutor did not argue to the jury that defendant had stolen the welder, but rather asserted that Bunnell's testimony was important to show Cheryl's state of mind. Defendant testified that he had a friendly relationship with Cheryl, and that she had invited him into her home on the day of the crime. Evidence that she thought defendant previously had stolen from her was admissible to impeach defendant's testimony in this regard. The circumstance that defendant did not testify until after Bunnell had testified does not change the conclusion *on appeal* that Bunnell's statements regarding Cheryl's state of mind were admissible. ■ " ' "[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." [Citation.]' (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)" (*People* v. *Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

Defendant also asserts that the evidence should have been excluded because it was unreliable. (Evid. Code, § 1252.) He notes that neither Cheryl nor Bunnell had personal knowledge that defendant stole the welder, and that defense counsel had no opportunity to cross-examine Cheryl to test the veracity of her statement. As explained above, however, the prosecutor did not use the evidence as proof of the truth of the circumstance that defendant had committed a theft. Whether or not defendant stole the welder, Cheryl suspected that defendant had done so. Nothing in the record suggests that Cheryl spoke dishonestly to Bunnell when she indicated her belief to him, or that she had a motive to fabricate that belief. Defense counsel did not question Bunnell regarding the circumstances of Cheryl's statement, nor did counsel object to the testimony on this ground. We therefore reject defendant's contention that the statement was made under circumstances indicating a lack of trustworthiness. (See *People* v. *Jones, supra,* 13 Cal.4th at pp. 548-549.)

In any event, the testimony to which defendant objected on redirect examination essentially restated Bunnell's testimony elicited by defendant,

without a motion to strike, on cross-examination. Therefore, the evidence elicited on redirect examination was cumulative, and any error in overruling defendant's objection during redirect examination was harmless.

### 7. *Photographs of the Victim*

The trial court admitted, over defendant's objection, two photographs depicting Cheryl's body as it was discovered after the crime. The photographs show the neck wounds from different angles, semen stains, and the location of Cheryl's pants and wallet lying next to the body.

The prosecutor offered the photographs to demonstrate malice and the use of a deadly weapon, both relevant to the murder charge, the location of the body and clothes, and the presence of semen stains, each relevant to the attempted rape charge, and the location of the wallet as relevant to the robbery charge. The prosecutor also asserted that the photographs corroborated and illustrated the testimony of several prosecution witnesses who described the crime scene. Defendant contended that the probative value of these photographs was outweighed by their prejudicial effect, and that they should be excluded. (Evid. Code, § 352.) In overruling defendant's objection, the trial court observed that the photographs were not particularly gruesome and did not depict a close-up view of the wounds, that they corroborated the testimony of Cheryl's daughter and other witnesses who first discovered the body and the location of items around the body, and that their probative value in this regard outweighed the danger of prejudice.

Defendant contends that the photographs were completely irrelevant, because they were probative only of matters not in dispute and were cumulative of easily understood testimony of prosecution witnesses on the same topics. He further contends that the admission of the photographs was extremely prejudicial, particularly because the jury knew that Cheryl's six-year-old daughter discovered her mother in the precise circumstances depicted in the photographs. Defendant maintains that the trial court abused its discretion in admitting the photographs, thereby denying defendant due process of law, a fair trial by an impartial jury, and reliable guilt and penalty verdicts.

"The trial court has broad discretion in determining the relevance of evidence [citations] . . . ." (*People* v. *Scheid* (1997) 16 Cal.4th 1, 14 [65 Cal.Rptr.2d 348, 939 P.2d 748].) Photographs of a murder victim that illustrate the testimony of prosecution witnesses are relevant to corroborate that testimony and to establish that a murder occurred. (*Id.* at pp. 14-15.) Contrary to defendant's claim, evidence does not become irrelevant simply

because other evidence may establish the same point. Furthermore, "the circumstance that defendant did not challenge the testimony of [prosecution witnesses] as to anything depicted in the photograph did not render the photograph irrelevant; as noted, the photograph served to clarify their testimony. [Citations.]" (*Id.* at p. 17.)

"'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' [Citation.]" (*People* v. *Scheid, supra,* 16 Cal.4th at p. 18.) "'[W]e have described the "prejudice" referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citation.] As we previously have observed, victim photographs and other graphic items of evidence in murder cases always are disturbing. [Citation.]' [Citations.]" (*Id.* at p. 19.)

We repeatedly have rejected the argument that victim photographs should have been excluded under Evidence Code section 352 simply because they were cumulative of other evidence. (*People* v. *Scheid, supra,* 16 Cal.4th at p. 19, and cases cited.) Furthermore, our independent review of the original photographs introduced at trial convinces us that they are not unduly gory or inflammatory. As the trial court observed, the photographs are not close-up views of the victim's wounds or a revolting portraiture that conceivably could inflame a jury. In light of the testimony, including that of Cheryl's daughter, detailing all the circumstances of the crime scene and the condition of the victim, the photographs were not so gruesome as to have impermissibly swayed the jury. (*Id.* at pp. 19-20.) We conclude that the trial court properly could find that the probative value of the photographs outweighed their potentially prejudicial effect, and that the court did not abuse its discretion in admitting them into evidence.

Defendant also contends that the trial court abused its discretion in admitting Cheryl's California identification card, which contained a photograph of her while she was alive. The trial court admitted the card into evidence because it had a bloodstain on it, and a prosecution witness testified that the bloodstain contained a genetic marker common to Cheryl and foreign to defendant. Defendant objected to the admission of the identification card to the extent it showed Cheryl while she was alive. Defense counsel contended that the photograph was irrelevant and "possibly prejudicial," and he offered to stipulate that Cheryl was alive before the crime. (See

*People* v. *Ramos* (1982) 30 Cal.3d 553, 577-578 [180 Cal.Rptr. 266, 639 P.2d 908], revd. on other grounds *sub nom. California* v. *Ramos* (1983) 463 U.S. 992 [103 S.Ct. 3446, 77 L.Ed.2d 1171] [defendant's stipulation (that the murder victim was a human being who was alive before the offense) rendered irrelevant a photograph of the victim taken while she was still alive]; cf. *People* v. *Scheid, supra,* 16 Cal.4th at pp. 16-17 [the prosecution generally is not compelled to accept stipulations in lieu of photographic evidence].) Defendant also claimed that, to the extent the card was relevant because of the bloodstain, it was cumulative of other items of evidence found with blood on them. The court refused to exclude the card simply because it contained some information defendant believed was irrelevant.

As explained above, evidence does not become irrelevant solely because it is cumulative of other evidence. Moreover, defendant concedes that the card was relevant to show a theft. We believe it also was relevant to prove elements of the charged crimes of murder and robbery. Nor was the photograph on the identification card unduly prejudicial. In *People* v. *Thompson* (1988) 45 Cal.3d 86, 114-115 [246 Cal.Rptr. 245, 753 P.2d 37], we held that the trial court did not abuse its discretion in admitting a photograph of the victim while she was alive. The photograph at issue portrayed an attractive young woman in a party dress and wearing a flower in her hair. We explained that even if the victim's status as a live human being at the time of the crime was not an issue, the photograph was relevant because a witness identified the victim based upon that photograph. Moreover, the photograph was not "particularly calculated to elicit sympathy. . . . [It] was . . . simply a picture of the victim alive." (*Id.* at p. 115; see also *People* v. *Hovey* (1988) 44 Cal.3d 543, 571 [244 Cal.Rptr. 121, 749 P.2d 776] ["ordinary head and shoulders portrait" of the victim before her death was not likely to have a prejudicial impact].) Similarly, in the present case, the identification card on which the photograph appeared was relevant because of the bloodstain and related testimony, and the photograph was not calculated or used to arouse the sympathy of the jury. Defendant contends on appeal that the trial court should have blocked out the photograph on the card, but in the trial court he never suggested this alternative, and he has not established that blocking out the photograph would not have erased part of the bloodstain as well. In any event, not only was admission of the small photograph on the identification card not error, but it could not have prejudiced defendant under the circumstances. (*People* v. *Thomas* (1992) 2 Cal.4th 489, 523 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

### 8. *The Instruction on Possession of Recently Stolen Property*

The trial court instructed the jury on theories of both premeditated and felony murder. In addition to instructions setting forth the elements of

the crimes of robbery and burglary, the court gave the following instruction based upon CALJIC No. 2.15 (5th ed. 1988): "Conscious possession of recently stolen property is not by itself sufficient to permit an inference that the defendant is guilty of the crime of robbery or burglary. Before guilt may be inferred, there must be corroboration [*sic*] evidence tending to prove the defendant's guilt. However, the corroborating evidence may only be slight and need not by itself to [*sic*] be sufficient to warrant an inference of guilt. [¶] As corroboration, you may consider the attributes of possession, time, place and manner[,] that the defendant had an opportunity to commit the crime charged, the defendant's conduct, his false or contradictory statements, if any, and/or other statements he may have made with reference to the property[, a] false account of how he acquired possession of the stolen property, [and] any other evidence which tends to connect the defendant with the crime charged."

Defendant contends that this instruction permitted the jury to convict him of burglary, robbery, and felony murder—and to find burglary and robbery special circumstances—without ever considering whether he had the mental states required for the crimes of burglary and robbery. According to defendant, CALJIC No. 2.15 may be used when burglary or robbery is charged only if the sole contested issue is the identity of the perpetrator. Because in the present case it was disputed whether a robbery or burglary had been committed, and also whether the money and towel found in defendant's automobile had been stolen from the victim, defendant contends that the instruction raised an irrational permissive presumption or inference of guilt that violated his right to due process of law under the federal and California Constitutions. (See *Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 157 [99 S.Ct. 2213, 2225, 60 L.Ed.2d 777] [a permissive presumption violates the due process clause "only if, under the facts of the case, there is no rational way the trier [of fact] could make the connection permitted by the inference"]; *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1243-1244 [278 Cal.Rptr. 640, 805 P.2d 899] [same].) Defendant maintains that there is no rational connection between conscious possession of stolen property and *how* that property was taken (e.g., with regard to the robbery charge, by means of force or fear with the specific intent to permanently deprive the victim of the property).[7]

We have stated that "where the evidence relating to 'possession' [of recently stolen property] is conflicting or unclear, an unqualified instruction

---

[7]According to the Attorney General, defendant has waived this argument because defendant did not object in the trial court to the instruction. The Attorney General relies upon the principle that "[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. [Citation.]" (*People* v. *Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627].) Defendant's claim, however, is that the instruction is *not* "correct in law," and that it violated his right to due process of law; the claim therefore is not of the type that must be preserved by objection. (§ 1259 ["The appellate

pursuant to CALJIC No. 2.15 should not be given, for it could easily mislead the jury into assuming that the defendant's possession has been established when, in actuality, the issue is in doubt." (*People* v. *Morris* (1988) 46 Cal.3d 1, 40 [249 Cal.Rptr. 119, 756 P.2d 843], overruled on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6 [37 Cal.Rptr.2d 446, 887 P.2d 527].) In *Morris*, we found insufficient evidence to warrant the giving of the instruction when the only indication that the defendant possessed stolen property was the testimony of one witness who stated the defendant had presented a credit card that had been loaned to the victim. We also held, however, that there was no likelihood the jury was misled, because other instructions cautioned the jurors that they should disregard any instruction that applied to a state of facts they determined did not exist. (46 Cal.3d at pp. 40-41.)

It is not the case, however, that CALJIC No. 2.15 is appropriate only when identity is the sole contested issue. We have upheld use of CALJIC No. 2.15 in cases in which the defendant's intent to steal was contested. (*People* v. *Holt* (1997) 15 Cal.4th 619, 676-677 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People* v. *Johnson* (1993) 6 Cal.4th 1, 35-38 [23 Cal.Rptr.2d 593, 859 P.2d 673].) In *Johnson*, it was also disputed whether the property in defendant's possession had been stolen from the victims. (*Johnson, supra*, 6 Cal.4th at pp. 36-37.) In both of these decisions, we found no error in giving the instruction—and no constitutional violation—when there was corroborating evidence sufficient to permit the jury to find beyond a reasonable doubt possession of stolen property and intent to steal.[8] In *Holt*, we additionally observed: "[The jury] was also instructed on all of the required elements of burglary and robbery and was expressly told that in order to prove those crimes, each of the elements must be proved. We see no possibility that giving the jury the additional admonition that it could not rely solely on evidence that defendant possessed recently stolen property would be understood by the jury as suggesting that it need not find all of the statutory elements of burglary and robbery had been proven beyond a

court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."]; *People* v. *Flood* (1998) 18 Cal.4th 470, 482, fn. 7 [76 Cal.Rptr.2d 180, 957 P.2d 869].) Therefore, we find it unnecessary to consider defendant's claim that defense counsel's failure to object denied him effective assistance of counsel.

[8]*People* v. *Johnson, supra*, 6 Cal.4th at pages 35-36, concerned a version of CALJIC No. 2.15 that was substantially similar to the instruction given in the case now before us. *People* v. *Holt, supra*, 15 Cal.4th at pages 676-677, involved the present version (CALJIC No. 2.15 (6th ed. 1996)), which states in part: "*If you find* that a defendant was in conscious possession of recently [stolen] [extorted] property, the fact of that possession is not itself sufficient to permit an inference that the defendant . . . is guilty of the crime of . . . ." (Italics added.) Our analysis in *Holt* did not depend upon the italicized, revised language in the current version.

reasonable doubt." (*Holt, supra,* 15 Cal.4th at p. 677.) Without acknowledging *Holt,* defendant urges us to reconsider *Johnson's* conclusion in this regard. In light of our recent endorsement of *Johnson* in *Holt,* we decline to do so.

In the present case, ample evidence permitted the jury to find beyond a reasonable doubt possession of stolen property and intent to steal. Two witnesses testified that after arguing with Swetts regarding the $200 defendant owed her, and after she had refused to accept the $44 he offered as partial payment, defendant said that he was going to go up the hill, and when he came back, he would have the rest of her money. Within an hour, another witness observed defendant's vehicle stop near Cheryl's driveway. Cheryl's daughter saw defendant, with a knife in his hand, go inside the trailer with Cheryl. Defendant admitted going inside with his knife and killing Cheryl. During the week before her death, Cheryl had cashed a welfare check and also changed a $100 bill at the store in Glencoe. Cheryl's wallet was found lying next to her body; it contained no paper money, and two cards in the wallet were stained with blood containing genetic markers consistent with Cheryl's. The only money found in the trailer was some loose change and a $20 bill lying on the floor underneath a chair on which Cheryl's purse was hanging with the flap open. Approximately $70 was found in defendant's automobile after he was arrested, along with a towel consistent with others observed in Cheryl's bathroom. In addition, defendant purchased items at the store in Mokelumne Hill with a $20 bill found to be stained with blood consistent with Cheryl's genetic markers, and a $1 bill that fell out of his pocket when he was arrested was stained with the same type of blood.

This corroborating evidence is far more extensive than that found insufficient to warrant an instruction pursuant to CALJIC No. 2.15 in *People v. Morris, supra,* 46 Cal.3d at pages 40-41, and constitutes sufficient evidence to permit the jury to find beyond a reasonable doubt possession of stolen property and intent to steal. (*People v. Holt, supra,* 15 Cal.4th at p. 677; *People v. Johnson, supra,* 6 Cal.4th at pp. 36-38.) In other words, the jury rationally could connect this evidence to guilt of robbery and burglary. (*Ulster County Court v. Allen, supra,* 442 U.S. at p. 157 [103 S.Ct. at p. 2225].) Therefore, the trial court did not err in giving this instruction. Moreover, as in *Holt,* the jury was instructed on all the required elements of burglary and robbery, and was told expressly that in order to prove those crimes, each of the elements must be proved. As in *Morris,* other instructions cautioned the jurors that they should disregard any instruction that applied to or suggested facts they determined did not exist. Considering the instructions in their entirety, as we must (*People v. Musselwhite, supra,* 17 Cal.4th at p. 1248), we find no possibility that instructing the jurors pursuant to CALJIC

No. 2.15 suggested that they need not find that all the statutory elements of burglary and robbery had been proven beyond a reasonable doubt (*Holt, supra*, 15 Cal.4th at p. 677), or that they could ignore defendant's evidence regarding his mental state.[9]

### 9. *The Instruction on Deliberation and Premeditation*

■■■ The trial court instructed the jury in the language of CALJIC No. 8.20, the standard instruction regarding deliberate and premeditated murder. At the prosecutor's request, however, the court modified the instruction by adding the following statement: "To prove the killing was deliberate and premeditated, it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his act."[10] This statement was taken verbatim from section 189, which defines first degree murder. The statute's elimination of the need to prove mature and meaningful reflection was a legislative abrogation of *People* v. *Wolff* (1964) 61 Cal.2d 795, 819-822 [40 Cal.Rptr. 271, 394 P.2d 959], which had imposed such a requirement. (See *People* v. *Swain* (1996) 12 Cal.4th 593, 616 [49 Cal.Rptr.2d 390, 909 P.2d 994] [the 1981 amendment to section 189 overruled *Wolff*].)

---

[9]Defendant also contends that his sentence of death must be reversed because the instruction raised an improper presumption and precluded consideration of his mental state evidence. Because we determine that the instruction did not have the effect claimed by defendant, we reject his argument that the giving of the instruction renders his sentence unconstitutional.

[10]The entire instruction, with the modified portion in italics, stated:

"All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree.

"The word 'willful,' as used in these instructions, means intentional.

"The word 'deliberate' means formed or arrived at or determined upon as a result of the careful thought and weighing and consideration for and against the proposed course of action.

"The word 'premeditated' means considered beforehand.

"If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so it must have been formed upon pre-existing reflection and not under a sudden heat or [*sic*] passion or other condition precluding the idea of deliberation, it is murder in the first degree.

"*To prove the killing was deliberate and premeditated, it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of this act.*

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.

"The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

"To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill."

Defendant objected to the modification on the ground that at least one unidentified Court of Appeal decision had questioned the meaning of the phrase "maturely and meaningfully reflected." Defendant requested that, if the court gave the modified version of CALJIC No. 8.20 requested by the prosecutor, it also read the following language at the end of the instruction: "However, an intentional killing is not first degree murder, when based on a theory of a willful, deliberate and premedi[t]ated killing, unless it is shown that the accused harbored not only an intent to kill but that such intent was the result of forethought and reflection, and demonstrated careful thought and a weighing of considerations." In denying defendant's requested instruction, the court observed that the proposed language came from a decision in which the appellate court did not intend to devise an instruction to be given in all cases. (*People* v. *Martinez* (1987) 193 Cal.App.3d 364, 369 [238 Cal.Rptr. 265].) The prosecutor's modification, on the other hand, was taken directly from the Penal Code.

Defendant contends that the modified version of CALJIC No. 8.20 read to the jury was reasonably likely to have confused the jury regarding the mental state required for deliberate and premeditated murder. According to defendant, instructing the jurors that defendant need not have reflected maturely and meaningfully upon the gravity of his act essentially informed them that they could convict him of first degree murder even if they found that he had "immaturely and frivolously reflected" on the gravity of his act, with little thought or regard for the consequences. Defendant contends that section 189's reference to mature and meaningful reflection can be understood only in the context of *Wolff* and its progeny, which he asserts required a showing that the defendant must have been "mentally well" and have acted despite a "realization of the enormity of the evil" associated with the act. (See *People* v. *Wolff, supra,* 61 Cal.2d at p. 822.) Because the trial court did not provide a definition of the phrase that included these concepts, defendant maintains that the jurors were misled into believing that they could find premeditation and deliberation if there was evidence that defendant simply committed the killing. He further contends that the instruction undermined the specific intent instructions applicable to the charged crimes of attempted rape, robbery, and burglary, because the phrase was likely to have caused the jury to believe that defendant need not have been aware of what was happening. He claims that the error lowered the prosecution's burden of proof and denied him the right to a jury determination on the mental state elements of all the charged crimes and special circumstance allegations, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions in the California Constitution.

 " '[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily

sufficient when the defendant fails to request amplification. . . .' [Citations.] [¶] The rule to be applied in determining whether the meaning of a statute is adequately conveyed by its express terms is well established. When a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citations.] . . . [T]erms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance. [Citation.]" (*People* v. *Estrada* (1995) 11 Cal.4th 568, 574-575 [46 Cal.Rptr.2d 586, 904 P.2d 1197], original italics.)

 The words in the phrase "maturely and meaningfully reflected" are commonly understood terms that convey the same meaning in both section 189 and our decision in *People* v. *Wolff, supra,* 61 Cal.2d at page 821. Therefore, the trial court had no obligation to provide further clarification of the statutory language. (*People* v. *Estrada, supra,* 11 Cal.4th at p. 581.) In any event, the substance of the clarification requested by defendant already was included in CALJIC No. 8.20. Defendant's proposed addition would have told the jury it must find that the intent to kill "was the result of forethought and reflection, and demonstrated careful thought and a weighing of considerations." The instruction given to the jury, however, defined "deliberate" as requiring "careful thought and weighing and consideration for and against the proposed course of action," and defined "premeditated" as "considered beforehand." Furthermore, it required that the intent to kill be "formed upon pre-existing reflection and not under a sudden heat [of] passion or other condition precluding the idea of deliberation . . . ." The instruction excepted "a mere unconsidered and rash impulse" from the definition of deliberation, and stated that defendant "must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill."

Considering the instruction as a whole, we find no reasonable likelihood that the jury misunderstood the phrase "maturely and meaningfully reflected" in the manner suggested by defendant. The instruction made clear that reflection must have preceded commission of the crime and could not have been unconsidered or rash, but rather must have resulted from careful thought and a weighing for and against the chosen course of action. There is no reasonable likelihood that the jury believed it could find deliberation and premeditation solely from evidence that defendant intended to kill, or solely from evidence that he committed the act, as defendant contends. We conclude that the trial court did not err in giving only the modification proposed

by the prosecutor, and that the instruction did not mislead the jury regarding the requisite mental states for first degree murder or any of the other charged crimes.[11]

### 10. *The Instruction on Flight*

■ The trial court instructed the jury with a modified version of CALJIC No. 2.52, regarding flight after crime: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] Whether or not evidence of flight shows a consciousness of guilt, and the significance to be attached to such a circumstance, are matters for your determination."

Defendant contends there was insufficient evidence of flight to warrant this instruction.[12] "In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' [Citations.] ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." ' [Citations.] '*Mere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the *circumstances* of departure from the crime scene may sometimes do so.' [Citation.]" (*People* v. *Bradford* (1997) 14 Cal.4th 1005, 1055 [60 Cal.Rptr.2d 225, 929 P.2d 544], original italics.) In the present case, there was strong evidence that defendant rammed his automobile through a closed gate as he was leaving the victim's property. Although he admitted killing Cheryl and claimed that he left to get help for her, defendant drove to another town instead of summoning help by telephone or going to the neighboring store in Glencoe. This evidence was sufficient to suggest that his purpose was to avoid being observed or arrested. (Cf. *People* v. *Jackson* (1996) 13 Cal.4th 1164, 1226 [56 Cal.Rptr.2d 49, 920 P.2d 1254] [the jury reasonably may

[11]Defendant also contends that the modified version of CALJIC No. 8.20 requires reversal of his death sentence, because the instruction violated the heightened requirements of due process of law in a capital case, and misled jurors in their penalty deliberations. He further maintains that a death sentence constitutes cruel and unusual punishment when an instructional error relieves the prosecution of its burden of proving beyond a reasonable doubt the mental state element of first degree murder. Because we determine that the challenged instruction was not improper or misleading, we reject defendant's claim.

[12]Despite the Attorney General's contention to the contrary, defendant did not waive this claim by failing to object to the instruction in the trial court. (See fn. 7, *ante*.)

infer guilt from evidence that the defendant ran from the scene of the murder down the street to a vehicle and then drove home].)

In a contention similar to his challenge to the instruction regarding possession of recently stolen property, defendant also asserts that the flight instruction created an unconstitutional permissive presumption of guilt. (See pt. II.A.8., *ante*.) According to defendant, CALJIC No. 2.52 should be given only when the identity of the perpetrator is disputed, and not when the principal disputed issue is the defendant's mental state at the time of the crime. We repeatedly have rejected this claim. (E.g., *People* v. *Bolin* (1998) 18 Cal.4th 297, 327 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People* v. *Ray* (1996) 13 Cal.4th 313, 345-346 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People* v. *Visciotti* (1992) 2 Cal.4th 1, 60-61 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 578-580 [286 Cal.Rptr. 628, 817 P.2d 893].) We decline defendant's invitation to reconsider these decisions. The trial court did not err in giving the flight instruction, and the instruction did not create an unconstitutional presumption of guilt.

11. *The Supplemental Instruction Regarding Special Circumstances*

During the jury's deliberations, shortly after the jurors had requested and been given the verdict forms, the court received a note signed by the foreperson "inquiring as to the special circumstance verdict forms." This note was misplaced and is not in the appellate record, but the trial court recalled that "the jury was confused as to how to approach the special circumstances, and that the jurors did not understand the use of the special circumstances, and when they come into play." In response to the note, the court instructed the jury in pertinent part as follows: "Apparently there is some confusion regarding what these special circumstances verdicts are. [¶] Now, the special circumstances verdicts come into play only in the event that the defendant was found guilty of murder in the first degree. And if he's found guilty of any other charge, murder in the second degree or involuntary manslaughter, these are not to be used. [¶] Only in the event that he is found guilty of murder in the first degree, then in that event you then find true or not true the three special circumstances that are alleged. [¶] And by reading the form here, you will see that there are three special circumstances alleged, alleging that the murder was committed while engaged in the . . . commission or attempted commission of burglary in the first degree, and you would look at that and find whether that is true or not true. [¶] The second one is while the murder was committed while he was engaged in the commission or attempted commission of robbery, and you would look to find whether that was true or not true. [¶] And then the third one, the murder was committed while he was engaged in the attempted commission of the crime of rape, and

you would look at that and say whether that is true or not true. [¶] At the bottom of each one it says 'make only one finding.' That refers to the true or not true part. That may be a little confusing, too. . . ."

After the jury resumed its deliberations, defense counsel complained that the court had not also informed the jury that "[a] special circumstance referred to in these instructions is not established if the robbery, rape, or burglary was merely incidental to the crime of murder." The court responded that it already had given such an instruction with all the other jury instructions, and it agreed with the prosecutor's observation that the jury's question had "come out with the verdict forms themselves" and "was designed to receive an answer as to how these verdict forms might come into play." Defense counsel replied that the jury appeared to be confused regarding the special circumstances, and he asked the court to reread in their entirety the special circumstance instructions previously given, including the pinpoint instruction it had read regarding advancement of the independent felonious purpose of robbery.[13] The court denied defendant's request but sent a note to the foreperson that stated: "It occurred to me that I did not fully answer your inquiry regarding the special circumstances findings. Please indicate at the bottom if you would like to have read the instructions that might be applicable or whether the explanation I gave was sufficient." The foreperson indicated that the jurors understood the court's answer to their question, and the court gave no further instructions.

 Defendant contends that reinstructing the jury with fewer than all the instructions on the three special circumstances did not eliminate the jurors' confusion. The effect of the supplemental instruction responding to the foreperson's note, according to defendant, was to permit true findings on the special circumstances even if each underlying felony was merely incidental to the murder. Defendant contends that the incomplete instruction

---

[13]The pinpoint instruction stated: "A murder is not committed in the commission or attempted commission of a robbery within the meaning of [the] special circumstances statute unless the accused has killed in order to advance the independent felonious purpose of robbery. [¶] An alleged robbery upon which a robbery special circumstance is based is merely incidental to the commission of a murder if the accused's primarily [sic] goal was not to steal but either to kill or to commit some other crime which resulted in the victim's death. [¶] If you find that the alleged robbery herein was incidental to the killing of the victim, then you shall find that the robbery special circumstances [sic] is not true."

Defendant previously had objected to the order in which this instruction was read to the jury. The trial court placed it after the instruction concerning the burglary special circumstance, rather than after the one based upon robbery. The trial court responded that it did not want to call special attention to the instruction by rereading it, but that if the instructions had to be reread at some later time, "the Court will straighten it out." Defendant contends that the instruction in response to the jury's question did not rectify the confusion caused by reading the pinpoint instruction out of order, but rather compounded it.

deprived him of the right to have the jury instructed on all elements of the special circumstances, in violation of his rights to due process of law and a jury trial.

Section 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law.[14] (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1212 [275 Cal.Rptr. 729, 800 P.2d 1159].) If, however, " 'the original instructions are themselves full and complete, the court has discretion under . . . section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*People* v. *Davis* (1995) 10 Cal.4th 463, 522 [41 Cal.Rptr.2d 826, 896 P.2d 119], quoting *People* v. *Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1213.) The trial court properly exercised its discretion. The jury's note, which was sent to the court along with the special circumstance verdict forms, expressed confusion regarding the verdicts themselves. The court reasonably concluded that the jury was uncertain whether and under what circumstances it should complete some or all of these verdict forms. The court's explanation was clear and correct. To the extent the court referred to the substantive definition of the special circumstances, its supplemental instruction simply repeated the language appearing on the verdict forms themselves. Thus, the verdict forms required the jury to find whether "the murder . . . was committed while defendant was engaged in the commission or attempted commission of the [rape, robbery, or burglary]." Because the court simply repeated the language appearing on the verdict forms (to which defendant has not objected), its explanation could not have prejudiced defendant. The jury had been read lengthy instructions on the special circumstances the previous afternoon, including the "merely incidental" and "independent felonious purpose" language requested by defendant, and the jury had a copy of the written versions of those instructions. We must assume it was clear to the jury that the court's explanation of the verdict forms did not purport to be a complete reinstruction on the special circumstances. The court reasonably declined to instruct further on the issue, particularly in light of the foreperson's indication that the jury no longer was confused. We find no reasonable likelihood that the jury believed it could find the special circumstances true without determining that the underlying crimes were not merely incidental to the murder.

---

[14]Section 1138 provides in relevant part: "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel . . . ."

### 12. *The Instructions Regarding Mental Disorder and Intoxication*

Defendant contends his trial counsel was ineffective in not requesting an instruction specifically advising the jury that it could consider his mental disorders in combination with his intoxication when assessing his mental state at the time of the offense. The jury was given one instruction permitting it to consider evidence of mental disease, defect, or disorder in determining whether defendant actually formed the requisite mental states, and another instruction allowing it to consider evidence of intoxication in determining whether defendant possessed such mental states.[15] Defendant contends that, without an additional instruction "harmonizing" these two instructions, the jurors were likely to believe they could not consider combined evidence of a mental disorder and intoxication in determining whether defendant harbored the mental states required to convict him. Defendant observes that he presented expert testimony that the combined effect of his mental disorders and intoxication at the time of the crime prevented him from actually forming the mental states required for the charged offenses, and that trial counsel had no reasonable tactical basis for failing to request an additional pinpoint instruction elaborating upon this theory of his defense. (See *People* v. *Saille, supra,* 54 Cal.3d at p. 1120 [defendant may seek a pinpoint instruction that relates the evidence of intoxication to an element of a crime, such as premeditation and deliberation].)

To succeed on a claim of ineffective assistance of counsel, a "[d]efendant must show that counsel's performance was both deficient and prejudicial, i.e., that it is reasonably probable that counsel's unprofessional errors affected the outcome. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687, 693-694 [104 S.Ct. 2052, 2067-2068, 80 L.Ed.2d 674]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-217 [233 Cal.Rptr. 404, 729 P.2d 839].) We have also said that if the record sheds no light on why counsel acted or

---

[15]The jury was instructed in pertinent part as follows:

"The mental state required is included in the definition of the crime charged. [¶] Evidence has been received regarding a mental disease, mental defect, or mental disorder of the defendant at the time of the crimes charged. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged. [¶] In . . . crimes charged in . . . the Information, and in the lesser included or related offenses . . . , necessary elements of the crimes are the existence in the mind of the defendant of certain specific intents and/or certain mental states. [¶] Such specific intents and mental states are included in the definition of the crime charged and the lesser included and related offenses.

"If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether the defendant had such specific intents and/or mental states. [¶] If from all the evidence you have a reasonable doubt whether the defendant formed such specific intents and/or mental states, you must find that he did not have such specific intents or mental states."

These instructions were based upon CALJIC Nos. 3.32 and 4.21 (5th ed. 1988).

failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance. (*People* v. *Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)" (*People* v. *Castillo* (1997) 16 Cal.4th 1009, 1014-1015 [68 Cal.Rptr.2d 648, 945 P.2d 1197].)

We need not inquire into why counsel failed to request an additional pinpoint instruction in the present case, however, because the court fully apprised the jury of the law applicable to defendant's mental state defenses, and no additional instruction was necessary. (*People* v. *Castillo, supra,* 16 Cal.4th at p. 1015.) " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.]" (*Id.* at p. 1016.) The instruction permitting the jury to consider evidence of intoxication was given only three paragraphs after the instruction referring to evidence of mental disease, defect, or disorder, and the instructions were read in the context of general instructions regarding the mental state required for all the charged offenses. Immediately following the instruction regarding evidence of intoxication, the court stated: "If *from all the evidence* you have a reasonable doubt whether the defendant formed such specific intents and/or mental states, you must find that he did not have such specific intents or mental states." (Italics added.) The instructions as a whole adequately informed the jury that it could consider the evidence of defendant's mental disease or defect, together with the evidence of his intoxication, in deciding whether the prosecution had carried its burden of proving the mental elements of the charged crimes beyond a reasonable doubt. The instructions did not hinder defense counsel from emphasizing to the jury during the closing guilt phase argument that the requisite mental states had not been proven because defendant's mental disease, defect, or disorder had exacerbated the effects of his intoxication. (Cf. *People* v. *Musselwhite, supra,* 17 Cal.4th at p. 1249; *People* v. *Castillo, supra,* 16 Cal.4th at pp. 1017-1018.) There is no reasonable likelihood that the jury was led to believe that it could not consider evidence of the combined effect of defendant's mental disorder and intoxication in determining his mental state. (See *People* v. *Samayoa, supra,* 15 Cal.4th at p. 833.) Therefore, defendant was not prejudiced by his counsel's failure to request an additional instruction.

Defendant also contends that the instruction regarding mental disorder was incomplete. The instruction permitted the jury to consider evidence of mental disease, defect, or disorder in determining whether defendant "actually formed the mental state which is an element of the crime charged." Defendant contends that this instruction failed to inform the jury that

"mental state" includes malice, premeditation and deliberation, and intent.[16] Therefore, according to defendant, the jury did not know that evidence of mental disease, defect, or disorder could raise a reasonable doubt regarding whether he harbored each of these particular mental states. Defendant claims that the failure to provide such an explanation to the jury raised an impermissible presumption regarding the mental states required to commit each crime with which he was charged.

We recently have rejected challenges to similar instructions regarding evidence of mental disorder or intoxication as related to the defendant's mental state. In *People* v. *Musselwhite, supra,* 17 Cal.4th at pages 1247-1249, the court refused to give the defendant's requested pinpoint instruction directing the jury to consider evidence of mental disorder in determining whether the defendant engaged in premeditation or deliberation or harbored malice aforethought. Instead, the court gave a more general instruction that the jury could consider such evidence solely for the purpose of determining whether the defendant actually formed the mental state that was an element of murder and attempted murder. Because the jury was instructed that malice, premeditation, and deliberation were the necessary mental states for murder and attempted murder, we held the instructions as a whole adequately informed the jury that it could consider evidence of mental disease or defect in deciding whether the mental elements of first degree murder had been proved beyond a reasonable doubt. (See also *People* v. *Jones* (1991) 53 Cal.3d 1115, 1145 [282 Cal.Rptr. 465, 811 P.2d 757] [the trial court had no duty to specify each of the mental states to which the evidence of mental disease or defect was relevant].)

In *People* v. *Castillo, supra,* 16 Cal.4th at pages 1014-1018, the court gave an instruction that the jury could consider evidence of the defendant's intoxication in determining whether he had formed the specific intent or mental state that is a necessary element of the crimes of murder and attempted murder. We rejected the defendant's argument that his counsel was ineffective in not requesting a pinpoint instruction permitting consideration of the intoxication evidence in deciding whether the defendant premeditated the killing. Because the other instructions correctly required the jury to find premeditation and deliberation before it could find the defendant guilty of first degree murder, we concluded that a reasonable jury would have understood deliberation and premeditation to be "mental states" that could be considered in connection with evidence of intoxication.

In the present case, the court instructed the jury that "[t]he mental state required is included in the definition of the crime charged." Thus, the

---

[16]The current version of this pattern instruction does set forth specific mental states required for various crimes. (CALJIC No. 3.32 (6th ed. 1996).)

definition of murder included an explanation of malice, premeditation, and deliberation. The instructions on attempted rape, robbery, and burglary also included explanations of the specific intent required for these crimes. As in the foregoing decisions, we find that a reasonable jury would have understood that the requisite mental states (as set forth in the definitions of the crimes) were the same "mental states" that could be considered in connection with the evidence of defendant's mental disease, defect, or disorder. We reject defendant's contention that the court's failure to refer to "specific intent" as well as "mental state" in the instruction on mental disorder requires a different conclusion. The court appears to have used the terms interchangeably, and the jury was not reasonably likely to believe that the term "mental state" did not encompass specific intent. The instruction was not improper and did not create a presumption that defendant acted with the mental states required for the charged crimes.

### B. *Penalty Phase Issues*

#### 1. *Photographs of the Victim*

Defendant contends that the two photographs depicting Cheryl's body as it was discovered after commission of the crimes should have been excluded from the penalty phase of the trial. He contends that the inflammatory nature of the photographs, together with the prosecutor's specific reference to them during the penalty phase argument, precluded a rational and reliable penalty determination as required by the Eighth Amendment.

In closing argument at the penalty phase, the prosecutor twice referred to these photographs. In commenting upon the circumstances of the murder, he noted that the photographs depicted the way Cheryl was found, and that she had blood on her hand, indicating that during the assault her hands went to her throat and she had "the tremendous horror of realizing the nature of the injury that had been inflicted upon her." The prosecutor further stated defendant "knew that the people who would find Cheryl Nesler were her small children, and he knew they would find her in the condition in which he left her, which was the condition you saw in the People's exhibits at the guilt phase of the trial." These comments and the photographs, according to defendant, distorted the evidence and inflamed the passions of the jury to the extent that a life sentence was virtually impossible.

We have rejected defendant's contention that these photographs should have been excluded from the guilt phase because they were unduly prejudicial. (Pt. II.A.7., *ante.*) To the extent the photographs may have resulted in different or heightened prejudice at the penalty phase, defendant did not

renew his objection to the photographs at the penalty phase, nor did he object to the prosecutor's reference to the photographs during argument. Therefore, defendant's argument has been waived on appeal. (*People* v. *Lucas* (1995) 12 Cal.4th 415, 490 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Because defendant contends in the alternative that the failure to object constituted ineffective assistance of counsel, we consider whether he was prejudiced by the jury's consideration of the photographs at the penalty phase. (See *People* v. *Kipp, supra,* 18 Cal.4th at pp. 366-367.)

We repeatedly have determined that photographs of victims' bodies may be admissible at the penalty phase to demonstrate graphically the circumstances of the crime, a factor relevant to the issues of aggravation and penalty. (E.g., *People* v. *Lucas, supra,* 12 Cal.4th at p. 490; *People* v. *Sanchez* (1995) 12 Cal.4th 1, 63-65 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People* v. *Medina* (1995) 11 Cal.4th 694, 775 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People* v. *Wader* (1993) 5 Cal.4th 610, 655 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People* v. *Raley* (1992) 2 Cal.4th 870, 914 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People* v. *Hardy* (1992) 2 Cal.4th 86, 199-200 [5 Cal.Rptr.2d 796, 825 P.2d 781].) The prosecutor's reference to the photographs during closing argument was not improper or unduly prejudicial. The jury was familiar with the facts of the crime, including the circumstance that the victim's young daughter had discovered the body. (Cf. *People* v. *Sanchez, supra,* 12 Cal.4th at p. 64.) The jury also was familiar with the photographs, which properly had been admitted at the guilt phase. Thus, even if defendant had renewed his objection to the photographs at the penalty phase of the trial, the court would not have abused its discretion in determining that the probative value of the photographs outweighed their prejudicial effect.

### 2. *Evidence of Prior Unadjudicated Criminal Activity*

Defendant challenges the admissibility of evidence regarding two incidents of unadjudicated criminal activity offered pursuant to section 190.3, factor (b): "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

The court conducted a preliminary inquiry, outside the presence of the jury, regarding the admissibility of evidence of a 1973 robbery. (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423] (plur. opn.).) At this hearing, John Cavins testified on direct examination that he was robbed at his tavern by defendant and another man. On cross-examination, Cavins could not positively identify defendant, who was seated in the courtroom, as one of the men who had robbed him in 1973, nor could

Cavins recognize defendant from booking and newspaper photographs taken in 1970. Cavins explained that he knew defendant because defendant had come into his tavern approximately five or six times during the 1960's, and defendant's brother had done some work at the tavern. Under further examination by defense counsel, Cavins explained that he had not seen defendant for six or seven years prior to the robbery. In response to a question from the court, however, Cavins stated that he knew defendant's name when defendant came into the tavern on the night of the robbery. Defense counsel then impeached Cavins with a police report indicating Cavins said he "thought he knew one of the subjects, but could not think of his name at that time." Cavins responded that the police report was inaccurate. At the conclusion of the hearing, the court found that Cavins's testimony was sufficient to identify defendant as the individual who committed the robbery.

At trial, Cavins testified that he knew defendant in 1973 because defendant had been in the tavern a few times before, and defendant's brother had done some work at the tavern. Cavins proceeded to testify concerning the circumstances of the robbery, indicating that defendant was one of the two perpetrators. On cross-examination, Cavins responded affirmatively to defense counsel's questions whether, on the night of the robbery, Cavins knew defendant. Counsel did not impeach Cavins with either the police report or his testimony from the hearing conducted outside the presence of the jury.

Defendant contends that evidence of the 1973 robbery should not have been admitted, because Cavins's testimony at the hearing was legally insufficient to show that defendant was one of the men who committed the robbery. Defendant claims that the testimony was unreliable and violated his Eighth and Fourteenth Amendment rights. As we have explained, however, the plurality opinion in *Phillips* did not impose a *requirement* of a preliminary inquiry to determine whether the prosecution's evidence of prior criminal activity is "substantial." (*People* v. *Clair* (1992) 2 Cal.4th 629, 677-678 [7 Cal.Rptr.2d 564, 828 P.2d 705]; see also *People* v. *Carpenter* (1997) 15 Cal.4th 312, 398-399 [63 Cal.Rptr.2d 1, 935 P.2d 708].) ▮▮▮ The trial court's decision to admit evidence of prior criminal activity is reviewable for abuse of discretion. (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1167 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People* v. *Clair, supra,* 2 Cal.4th at p. 676.) When testimony regarding the identity of the defendant as the perpetrator of the prior criminal act is equivocal, that circumstance affects the credibility of the witness, not the admissibility of his or her testimony. The trial court does not abuse its discretion if, "[v]iewing the totality of the evidence presented, a rational jury could conclude that defendant was the one" who committed the act. (*People* v. *Rodrigues, supra,* 8 Cal.4th at p. 1168.) ▮▮▮ In the present case, Cavins had difficulty identifying defendant at the hearing, but

he also stated that he knew who defendant was at the time of the robbery. Any inconsistencies in his testimony, or conflict with the police report prepared at the time, were matters affecting Cavins's credibility, not the admissibility of the testimony. At trial, Cavins testified without contradiction that defendant was one of the two perpetrators of the robbery. The trial court thus did not abuse its discretion in admitting evidence of the robbery.

Defendant contends that he received ineffective assistance of counsel because his attorney failed to object to Cavins's testimony at trial or to impeach Cavins with prior inconsistent statements regarding his ability to identify defendant. Because the court already had ruled the testimony admissible following the hearing, however, any objection would have been futile, and counsel therefore was not ineffective in failing to object to the testimony. (*People* v. *Padilla* (1995) 11 Cal.4th 891, 937 [47 Cal.Rptr.2d 426, 906 P.2d 388], overruled on another point in *People* v. *Hill, supra,* 17 Cal.4th at p. 823, fn. 1.) Assuming, for the sake of argument only, that counsel's failure to impeach Cavins constituted deficient performance, we find no reasonable probability that, but for counsel's omission, the result of the proceeding would have been different. (11 Cal.4th at p. 936.) Despite counsel's efforts to impeach Cavins at the hearing, Cavins insisted that he knew who defendant was when he came into the tavern on the night of the robbery. Cavins also testified that one of the two perpetrators asked about defendant's brother. Under these circumstances, it is not likely that the jury would have disbelieved Cavins's identification of defendant. Even if the jury had disbelieved his testimony, considering the circumstances of the crimes against Cheryl and the other instances of defendant's prior criminal activity, it is not reasonably probable that the jury's penalty determination would have been different.

Defendant also challenges the admission of evidence concerning his arrest for robbery in 1968. At the hearing conducted outside the presence of the jury, Paul Neblett testified that in 1968 he was a sheriff's department investigator in Tennessee. Defendant and defendant's brother were suspects in an armed robbery. The brother had been arrested and was in custody, but defendant still had not been apprehended. By posing as an ordinary citizen who wanted to post part of the bail for defendant's brother, Neblett arranged to meet defendant at the bonding company. Neblett asked defendant to step outside into an alley. Defendant kept his right hand in his jacket pocket, and in an attempt to get defendant to remove his hand, Neblett extended his right hand to introduce himself. Defendant hesitated a few moments and extended his left hand instead; Neblett then grabbed defendant's right hand, which was holding a loaded revolver. At that point, defendant "just kind of wilted," and Neblett disarmed defendant, placed him under arrest, and handcuffed

him. Defendant did not resist arrest. He later tried to escape from Neblett's vehicle but did not assault Neblett. Neblett's testimony at trial was substantially the same as that presented at the hearing.

Defendant contends, as he did at trial, that this testimony of prior criminal activity was inadmissible as aggravating evidence because his mere possession of a concealed weapon did not involve "the use or attempted use of force or violence or . . . the express or implied threat to use force or violence." (§ 190.3.) We have found an implied threat of violence, however, when the evidence permits an inference that the defendant possessed a dangerous weapon with the purpose of using it to avoid apprehension and successfully escape the scene of a crime; the circumstance that the defendant chose not to act upon his plan could not negate the implied threat to use the weapon against anyone who might interfere. (*People* v. *Clair, supra,* 2 Cal.4th at pp. 676-677.) Similarly, in the present case, the jury could infer an implied threat of violence from defendant's failure to remove his hand from the loaded weapon kept hidden in his jacket while he was attempting to avoid arrest. (Cf. *People* v. *Jackson, supra,* 13 Cal.4th 1164, 1235-1236 ["[A] defendant who arms himself after having escaped from custody can be presumed to be in possession of [a] gun to assist his continued flight rather than for legitimate self-defense or some other lawful purpose."].) Defendant was free to present any additional evidence regarding the incident that would have suggested he possessed the handgun for a lawful purpose. (*Id.* at p. 1236.) The trial court properly admitted the evidence concerning the circumstances of defendant's 1968 arrest.

Finally, defendant challenges the admission of evidence regarding these prior incidents on the ground they were so remote in time that requiring him to defend against the claims violated his constitutional rights to due process of law and a speedy trial, as well as his Eighth Amendment rights. Defendant failed to raise such an objection in the trial court, however, and he acknowledges that we repeatedly have rejected these and other challenges to the use of evidence of prior unadjudicated criminal activity under section 190.3, factor (b). (E.g., *People* v. *Bolin, supra,* 18 Cal.4th at p. 335; *People* v. *Jones* (1998) 17 Cal.4th 279, 312-313 [70 Cal.Rptr.2d 793, 949 P.2d 890]; *People* v. *Samayoa, supra,* 15 Cal.4th at p. 863; *People* v. *Carpenter, supra,* 15 Cal.4th at pp. 401-402; *People* v. *Cain* (1995) 10 Cal.4th 1, 69-70 [40 Cal.Rptr.2d 481, 892 P.2d 1224], and cases cited therein.) Defendant offers no persuasive reason for us to reconsider these decisions.

### 3. *The Exclusion of Deanna Lisa Russell's Deposition Testimony*

At the guilt phase of the trial, defendant moved for the court to appoint a commissioner to depose Deanna Lisa Russell in Tennessee. (See §§ 1349-1362.) Russell had been defendant's parole officer in that state. Defense

counsel asserted that Russell was the person who knew the most concerning efforts to obtain mental health treatment for defendant following his release from prison, and that her testimony would be relevant to mitigating factors at the penalty phase. Counsel explained that Russell was caring for a small infant, and that under these circumstances he did not want to subpoena her to testify at the trial. The prosecutor noted that such a deposition may be read into evidence at trial only if the witness is unavailable within the meaning of Evidence Code section 240 (§ 1362), and that Russell was not unavailable under that standard. Nevertheless, reserving the right to object to the admission of the deposition testimony at trial, the prosecutor stated that he had no objection to having the deposition taken, and that he might be willing to stipulate to its admission, depending upon the answers. The court granted defendant's motion but stated it was not ruling on the admissibility of Russell's answers at trial. Defense counsel and the prosecutor were given the opportunity to pose questions to be asked by the commissioner.

Russell testified at the deposition that defendant's parole in Tennessee included the special condition that he participate in a mental health program. She assumed the condition was imposed to facilitate readjustment to the community. After she made an initial referral to a mental health program, Russell received a letter from the director of the program. The director requested copies of defendant's latest psychological evaluation, parole board papers, and instructions regarding what information Russell wanted from an evaluation. Russell did not provide this information, because she could not disclose parole records without the written permission of the board of paroles. Therefore, she wrote a memorandum to a supervisor requesting guidance, but did not receive a response. Approximately one month after Russell received the program director's request for information, defendant was given permission to travel to California. When he returned to Tennessee, defendant was granted a transfer of his parole supervision to California.

At the penalty phase, defendant's sister-in-law testified that she accompanied defendant to the mental health facility in Tennessee, where defendant was informed he could not receive services until his probation officer provided some kind of paperwork. She and defendant then went to see Russell, who said she did not have the papers and would contact defendant when she received them. Russell never again mentioned the paperwork or mental health treatment to defendant during his subsequent visits with her. Defendant's brother, Enoch, testified that after defendant had wrecked two trucks, Enoch called a physician he knew to seek assistance in getting defendant into the mental health program. In Enoch's opinion, the States of Tennessee and California did nothing to help defendant fulfill his parole condition of receiving mental health care.

Defendant subsequently offered a stipulation that Russell's testimony be admitted into evidence and read to the jury. Defense counsel stated that the testimony would help the jury determine exactly why defendant did not receive mental health treatment in Tennessee. Defense counsel conceded that Russell was not unavailable within the meaning of the Evidence Code, that all he could do was offer the stipulation, and that the matter was "in the [prosecutor's] hands." The prosecutor refused to join the stipulation, and the trial court declined to admit the testimony.

Defendant now contends that Russell's testimony should have been admitted even though it falls within no exception to the hearsay rule. He relies upon his Eighth Amendment right at the penalty phase to have the jury consider all relevant mitigating evidence. (*Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [106 S.Ct. 1669, 1670-1671, 90 L.Ed.2d 1]; *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [102 S.Ct. 869, 874, 71 L.Ed.2d 1].) Defendant also relies upon the principle that "a defendant's due process rights are violated when hearsay testimony at the penalty phase of a capital trial is excluded, if both of the following conditions are present: (1) the excluded testimony is 'highly relevant to a critical issue in the punishment phase of the trial,' and (2) there are substantial reasons to assume the reliability of the evidence." (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 704 [276 Cal.Rptr. 788, 802 P.2d 278], quoting *Green* v. *Georgia* (1979) 442 U.S. 95, 97 [99 S.Ct. 2150, 2151, 60 L.Ed.2d 738]; see also *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302 [93 S.Ct. 1038, 1049, 35 L.Ed.2d 297] [the hearsay rule "may not be applied mechanistically to defeat the ends of justice"].)

In seeking admission of Russell's testimony at trial, defendant did not contend that the federal Constitution compelled admission of this hearsay testimony, and he may not do so for the first time on appeal. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1264-1265 [270 Cal.Rptr. 451, 792 P.2d 251].) Defendant claims, however, that he received ineffective assistance of counsel because his attorney failed to advance this argument in the trial court. Therefore, we consider whether defendant was prejudiced by the alleged deficiency in counsel's performance. (See *People* v. *Kipp, supra,* 18 Cal.4th at pp. 366-367.)

Although the Eighth and Fourteenth Amendments confer a right upon capital defendants to present all relevant mitigating evidence to the jury (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 4 [106 S.Ct. at pp. 1670-1671]), the United States Supreme Court never has suggested that this right precludes the state from applying ordinary rules of evidence to determine whether such evidence is admissible. (*People* v. *Ramos* (1997) 15

Cal.4th 1133, 1176, 1178 [64 Cal.Rptr.2d 892, 938 P.2d 950]; *People* v. *Fauber* (1992) 2 Cal.4th 792, 856 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Furthermore, in the present case the excluded deposition testimony simply corroborated the testimony of defendant's brother and sister-in-law concerning defendant's efforts to participate in the mental health program and the reason these efforts were unsuccessful. The trial court's application of the hearsay rule to exclude Russell's deposition therefore did not deprive defendant of his right to present relevant mitigating evidence.

Nor did application of the rules of evidence violate defendant's right to due process of law. In *Green* v. *Georgia, supra,* 442 U.S. at page 97 [99 S.Ct. at page 2151], evidence "highly relevant to a critical issue in the punishment phase" consisted of hearsay testimony that the defendant's accomplice had confessed to killing the victim after ordering the defendant to run an errand. The state had used the same testimony to obtain a conviction and death sentence in the accomplice's trial. The high court held that "[i]n these unique circumstances," application of the hearsay rule denied the defendant a fair trial on the issue of punishment. (*Ibid.*; cf. *Chambers* v. *Mississippi, supra,* 410 U.S. at pp. 289-303 [93 S.Ct. at pp. 1042-1050] [the defendant was denied due process when he could not use a witness's signed confession for impeachment after the witness denied any involvement in the murder].) Thus, in these decisions, the high court found due process violations when the excluded evidence was highly probative of the defendant's innocence. By contrast, we have held that if the exculpatory value of the excluded evidence is tangential, or cumulative of other evidence admitted at trial, exclusion of the evidence does not deny the accused due process of law. (E.g., *People* v. *Ramos, supra,* 15 Cal.4th at pp. 1178-1179 [corroborating evidence concerning the defendant's background]; *People* v. *Champion* (1995) 9 Cal.4th 879, 938 [39 Cal.Rptr.2d 547, 891 P.2d 93] [evidence that unidentified gang members told the defendant's parole officer that they believed the defendant was innocent]; *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 55-59 [14 Cal.Rptr.2d 133, 841 P.2d 118] [witness's preliminary hearing testimony of his recollection of police identification procedures]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 838-839 [1 Cal.Rptr.2d 696, 819 P.2d 436] [corroborating evidence regarding the defendant's good relationship with children].)

As explained above, in the present case Russell's deposition testimony simply corroborated other testimony presented at trial. Although, as defendant observes, Russell's testimony may have been considered more credible than that of defendant's relatives, its exclusion did not prevent defendant from presenting evidence to the jury regarding his attempt to receive mental health treatment in Tennessee. Moreover, the exculpatory value of this

evidence was tangential at best. Defendant left Tennessee for California approximately two months after he was released from prison, and approximately one month after the director of the mental health program requested the paperwork from defendant's Tennessee parole officer. Defendant called his California parole officer as a witness, who testified he had no knowledge of any efforts made in California to ensure that defendant fulfilled the mental health condition of his parole. Thus, to the extent defendant offered Russell's testimony as mitigating evidence to show that his lack of mental health treatment was the responsibility of his parole officers, there was ample evidence admitted at trial that showed the same circumstance. Therefore, even assuming Russell's deposition testimony was sufficiently reliable to be admitted at trial,[17] it was not highly relevant to a critical issue at the penalty phase.

Accordingly, exclusion of this evidence did not violate the Eighth Amendment or deprive defendant of due process of law. Defendant suffered no prejudice from his trial counsel's failure to argue that the testimony was admissible under this theory.

### 4. *The Prosecutor's Reference to Mitigating Evidence During Argument*

Defendant presented evidence that he had adjusted well to prison life when he was incarcerated in Tennessee. He had good relationships with inmates and prison staff, worked hard as a member of the prison maintenance crew, and engaged in hobbies such as building crafts from wood. This evidence was introduced pursuant to section 190.3, factor (k), which permits the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Defendant contends that the prosecutor committed misconduct during closing argument by using this evidence as an aggravating factor, thereby violating section 190.3 and defendant's Eighth Amendment rights.

In his closing argument at the penalty phase, the prosecutor described as aggravating factors defendant's previous criminal conduct and the circumstances of the present crime. He then stated: "And of course, before [defendant] committed this crime, why did he do it? Well, he thought the worst

---

[17]Defendant contends that the prosecutor's opportunity to pose questions, in advance, to be asked by the commissioner during Russell's deposition constituted an opportunity for cross-examination. We disagree. The prosecutor could not anticipate what Russell's testimony would be and had no opportunity to ask her to clarify her answers, or to impeach her testimony. We have stressed the importance of an opportunity for cross-examination in determining whether otherwise inadmissible testimony should be admitted to ensure a defendant's right to due process of law. (*People* v. *Edwards, supra,* 54 Cal.3d at p. 838.)

thing that can happen to me, I probably won't get caught. But if I do, *the worst thing that can happen to me, they're just going to send me back to prison again.* [¶] Well, Cheryl Nesler was not given any chance in this case. And she has left this life forever because of the acts of [defendant]; because of the acts of a man who's led the type of life that you'[ve] heard about. [¶] But he's asking you, ladies and gentlemen, for yet another chance, and he has had many. He's asking you for another chance, where Cheryl had none. [¶] *He wants to go back home to prison; prison where he gets along with the inmates, and gets along with the guards, where he gets three meals a day, and a roof over his head. He can make the crafts that he makes.* [¶] Is that justice, or does that amount in the case of [defendant] to no punishment at all. . . ." (Italics added.) In his rebuttal argument, after suggesting that defendant might pose a threat of violence in prison, the prosecutor stated: "But assuming he could function in prison, and wouldn't hurt anyone in prison, and wouldn't escape, is he a man that deserves this? Would that be punishment for [defendant], or would that be giving him a break that he does not deserve because he's received breaks in the past? *It would be sending him home to prison.* [¶] What is the reason to vote for the death penalty for [defendant]? The reason is clear. Society is not safe with [defendant] alive." (Italics added.)

Defendant did not object to the prosecutor's remarks in the trial court, and his claim therefore has been waived. (*People* v. *Millwee* (1998) 18 Cal.4th 96, 149 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People* v. *Lucas, supra,* 12 Cal.4th at p. 495.) In any event, the prosecutor's comments were not improper. "We have held that evidence of a defendant's background and character is admissible under section 190.3, factor (k), only to mitigate the gravity of the crime, and that it is improper for the prosecutor to urge that such evidence should be considered in aggravation. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 . . . .)" (*People* v. *Lucas, supra,* 12 Cal.4th at p. 494.) Nonetheless, " '[a] prosecutor does not mischaracterize [mitigating] evidence by arguing it should not carry any extenuating weight when evaluated in a broader factual context. We have consistently declined to criticize advocacy of this nature. [Citations.]' [Citation.]" (*People* v. *Jones* (1997) 15 Cal.4th 119, 184 [61 Cal.Rptr.2d 386, 931 P.2d 960], overruled on another point in *People* v. *Hill, supra,* 17 Cal.4th at p. 823, fn. 1.)

In *People* v. *Lucas,* for example, the defendant asserted "the prosecutor relied upon nonstatutory aggravating factors in arguing that prison would be an inadequate punishment for defendant, as his brutality was such that he 'would not even see the bars.' " (12 Cal.4th at p. 496.) We determined that such argument was not inappropriate, because it was based upon proper aggravating factors (defendant's brutality as demonstrated by the circumstances of the crime and prior violent criminal activity) and "was directed to

the jury's ' " '*individualized* assessment of the crucial issue whether the death penalty is appropriate for the particular defendant on trial.' " ' [Citation.]" (*Ibid.*, original italics; see also *People* v. *Frye* (1998) 18 Cal.4th 894, 1020-1021 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People* v. *Millwee, supra,* 18 Cal.4th at pp. 151-152.) ▇ Similarly, in the present case the prosecutor contended, in light of defendant's prior violent criminal activity and the circumstances of the present crime, that a sentence of life in prison would not be an appropriate punishment for defendant. The prosecutor did not ask the jury to consider defendant's adjustment to prison life as a factor in aggravation, but rather essentially urged the jury not to give this mitigating evidence extenuating weight in light of other aggravating factors. Therefore, defendant was not prejudiced by his counsel's failure to object to the prosecutor's argument.

 5. *The Prosecutor's Argument Concerning Sympathy for Defendant's Family*

 During closing argument at the penalty phase, the prosecutor stated: "Something else that I think needs to be discussed at this juncture is the sympathy that you are entitled to consider. [¶] What you have to do in this case is separate sympathy you may feel for the Defendant's family from sympathy you should consider for the Defendant. The sympathy that should be considered by you is sympathy for the Defendant, not for any of the Defendant's family members. [¶] And, of course, you naturally feel sympathy for the brothers and sisters who come in and have one of their loved ones charged and convicted with an offense like this, and facing the possible penalties that he's facing. [¶] It's only normal to consider that sympathy. But that is not the sympathy that plays into your weighing of aggravating and mitigating factors in this case. [¶] . . . [¶] . . . [I]t's very, very hard, I would imagine, for family members to realize that one of their loved ones has been convicted of this. [¶] So you feel sympathy for them, and you feel sympathy, of course, for the family members who have tried to help [defendant,] who have given [him] the opportunity to straighten his life out. [¶] He's turned his back on them as well. You can't help feeling sympathy for them, but it's not that sympathy, but sympathy for the Defendant that could come into play in this case . . . ." The prosecutor then stated that the law requires the jury to consider sympathy for defendant, but that the jurors individually must decide how much weight to give such sympathy. The prosecutor proceeded to discuss various aggravating factors.

 ▇ Defendant contends that the prosecutor committed misconduct by informing the jury it could not consider sympathy for defendant's family. According to defendant, this misconduct precluded the jury from considering

relevant mitigating evidence of defendant's character or record, in violation of the Eighth and Fourteenth Amendments and section 190.3, factor (k). (See *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973] ["the sentencer . . . [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (original italics, fns. omitted)]; *People* v. *Williams* (1997) 16 Cal.4th 153, 280-281 [66 Cal.Rptr.2d 123, 940 P.2d 710] [when instructing on section 190.3, factor (k), the court should inform the jury that it may consider in mitigation any other aspect of the defendant's character or record].) Noting that the jury may consider sympathy for the *victim's* family as aggravating evidence (*Payne* v. *Tennessee* (1991) 501 U.S. 808, 827 [111 S.Ct. 2597, 2609, 115 L.Ed.2d 720]; *People* v. *Edwards*, *supra*, 54 Cal.3d at p. 835), defendant maintains that sympathy for the *defendant's* family is relevant as well and should be considered as mitigating evidence. Defendant contends that the prosecutor's comments essentially directed the jury to ignore the testimony of defendant's siblings regarding the difficult circumstances of their childhood, which were relevant to defendant's character and record as well.[18]

We recently held that "sympathy for a defendant's family is not a matter that a capital jury can consider in mitigation, but that family members may offer testimony of the impact of an execution on them if by so doing they illuminate some positive quality of the defendant's background or character." (*People* v. *Ochoa* (1998) 19 Cal.4th 353, 456 [79 Cal.Rptr.2d 408, 966 P.2d 442].) We explained in *Ochoa* that when considering mitigating evidence in determining the penalty, the relevant factor "is a defendant's background and character—not the distress of his or her family. A defendant may offer evidence that he or she is loved by family members or others, and that these individuals want him or her to live. But this evidence is relevant because it constitutes indirect evidence of the defendant's character." (*Ibid.*) Thus, we determined that the trial court did not err in refusing the defendant's requested instruction that would have invited the jury to consider in mitigation sympathy for the defendant's family. Such an instruction impermissibly would have allowed the jurors to return a verdict of life imprisonment without the possibility of parole solely because they wished to spare the defendant's family the emotional distress of an execution.

Therefore, the prosecutor's argument in the present case properly directed the jury not to consider sympathy for defendant's family as mitigating

---

[18]Because defendant did not object to the prosecutor's remarks at trial, his claim of misconduct has been waived. (See pt. II.B.4., *ante.*) We nevertheless consider his argument, because defendant raises a related claim of ineffective assistance of counsel based upon his attorney's failure to object.

evidence. His comments did not preclude the jury from considering the testimony of defendant's family to the extent it might have been relevant to sympathy for *defendant*. Indeed, the prosecutor expressly told the jurors that the law *required* them to weigh sympathy for defendant in making their penalty determination. Contrary to defendant's assertion, the prosecutor's argument did not have the effect of inviting the jury to disregard all the testimony of defendant's family that was related to mitigating evidence of defendant's background. We find no prosecutorial misconduct and no constitutional violation.

### 6. *The Prosecutor's Comments Regarding Defendant's Escape From Prison and Potential Threat to Others in Prison*

Defendant contends that the prosecutor committed misconduct during closing argument at the penalty phase by falsely characterizing defendant's 1973 escape from prison as violent, and by arguing that defendant could pose a threat of violence to others in prison if he were sentenced to life imprisonment without the possibility of parole. According to defendant, the prosecutor's intentional presentation of false and misleading information to the jury introduced improper aggravating factors, depriving him of a fair trial and a reliable penalty determination.[19]

A defense witness at the penalty phase testified that defendant escaped from prison when he and approximately 10 other inmates cut through the roof of the cellblock and went over the wall using a rope ladder. The witness stated that no one was harmed during the escape. No evidence suggested that defendant possessed a weapon at the time of the escape, or that the escape itself otherwise involved violence or the threat of violence. The prosecution did present evidence, however, that after defendant escaped and before he was apprehended, defendant committed an armed robbery. (See pt. II.B.2., *ante.*)

During closing argument, in the course of discussing defendant's prior criminal activity, the prosecutor observed that defendant was sentenced to prison in 1969 for armed robbery, and that in 1973 he escaped. The prosecutor then stated: "Now, the fact that he's sentenced, or the fact that he escaped, are not factors in aggravation. They're just part of the history of the choices that he's made. [¶] Then while he was escaped, while he was out of prison, in April of 1973, he robbed Mr. Cavins, who came in and testified as to exactly what happened there. [¶] Again, he uses a firearm . . . ." After

---

[19]Although defendant did not object in the trial court to the prosecutor's argument, we nevertheless consider his claim to the extent necessary to assess whether he was prejudiced by any deficiencies in defense counsel's performance. (See pt. II.B.4., *ante.*)

referring to testimony regarding defendant's possession of a shank in prison, the prosecutor continued: "One of the threads that runs through all these events is that [defendant] always manages to get his hands on a deadly weapon. He has a gun, and he threatens to kill his wife, and fires the shots in the car. [¶] He is convicted of an armed robbery. *He's arrested. He has a gun, and he escapes from prison.* While he's escaped from prison, he manages to get a gun, and commits another act of violence." (Italics added.) Later in his argument, the prosecutor made the following comments: "Would [defendant] be a threat in prison? Possibly. He's escaped in the past, and when he's escaped, he's committed a violent act. [¶] The . . . only times he hasn't been in prison since 1969, he's committed violent acts; escape in 1973; robbed Mr. Cavins. And he's out for just barely over a year, after all this time in prison, and he commits the murder that has brought us here today."

Contrary to defendant's characterization of the prosecutor's remarks, we find the prosecutor did not suggest that defendant possessed a gun when he escaped from prison. In light of the evidence and previous argument, it is clear the statement, "He's arrested. He has a gun, and he escapes from prison," was transcribed with punctuation conveying a meaning different from that intended by the prosecutor. Defendant *did* have a gun when he was arrested for robbery. On no other occasion did the prosecutor imply that defendant was armed when he escaped, or that the escape involved violence; indeed, the prosecutor explicitly conceded that the escape could not be considered as an aggravating factor—something he would not have done if he could have asserted an implied threat of violence because of defendant's possession of a firearm. (See *People v. Jackson, supra,* 13 Cal.4th 1164, 1235-1236.) In addition, if defendant had possessed a gun when he escaped from prison, it is unlikely the prosecutor would have said that while defendant was at large, he managed to obtain a gun. Similarly, by stating that when defendant was not in prison, "he's committed violent acts; escape in 1973; robbed Mr. Cavins," the prosecutor was not suggesting that the escape was a violent act, but rather that defendant committed the violent act of robbery while he was at large after the escape. The prosecutor's argument did not mischaracterize the evidence.

 Nor did the prosecutor improperly suggest that defendant might pose a threat to others in prison. "It is settled that a defendant's knowing possession of a potentially dangerous weapon in custody is admissible under [section 190.3,] factor (b). Such conduct is unlawful and involves an implied threat of violence even where there is no evidence defendant used or displayed it in a provocative or threatening manner." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Defendant

offered an innocent explanation for his possession of a shank in prison (self-defense), as he was entitled to do, but the evidence remains admissible under section 190.3, factor (b). (4 Cal.4th at p. 589.) As a result of his possession of the weapon, defendant was placed in involuntary segregation "due to a threat to the population . . . ." Therefore, the prosecutor did not commit misconduct by suggesting that defendant might pose a threat of violence in prison. (*People* v. *Ramos, supra,* 15 Cal.4th 1133, 1172, 1174.)

### 7. *Applicability of the Guilt Phase Instruction on Mental Disorder*

At the guilt phase of the trial, the court instructed the jury that it could consider evidence regarding defendant's mental disease, defect, or disorder "solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged." Defendant contends that the court erred in failing expressly to inform the jury that this limitation upon the use of mental state evidence no longer applied at the penalty phase. The effect of the court's omission, according to defendant, was to bar the jury from considering his strongest mitigating evidence in support of a verdict other than death, in violation of the Eighth Amendment.

The court instructed the jury at the beginning and end of the penalty phase of the trial that it must consider, among other things, "whether or not the offense was committed when the defendant was under the influence of extreme mental or emotional disturbance," and "whether or not at the time of the offense, the capacity of the defendant to appreciate the criminality of his conduct, or to conform his conduct, as a requirement of law, was impaired as a result of mental disease or defect . . . ." Immediately following the enumeration of factors that must be considered in determining the penalty, the court stated: "You must disregard any instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle."

Defendant claims that the general admonition to disregard conflicting guilt phase instructions was insufficient to inform the jury that the limitation upon its consideration of mental state evidence no longer applied at the penalty phase. We have rejected similar claims of error based upon the trial court's failure to instruct the jury to disregard particular instructions given at the guilt phase. (E.g., *People* v. *Frye, supra,* 18 Cal.4th at pp. 1024-1025 [guilt phase instruction not to be influenced by sympathy]; *People* v. *Kipp, supra,* 18 Cal.4th at pp. 379-380 [guilt phase instruction to reach a just verdict regardless of the consequences]; *People* v. *Babbitt, supra,* 45 Cal.3d at pp. 717-718 [guilt phase instructions to disregard sympathy and the consequences of the verdict].) As in the foregoing decisions, the court in the present case did not repeat the inapplicable guilt phase instruction at the

penalty phase, the jury properly was instructed to consider the appropriate sentencing factors and to disregard any conflicting guilt phase instructions, and the parties presented evidence and argument regarding those factors. Accordingly, we find no reasonable likelihood the jury was misled by the absence of an instruction to disregard the mental disorder instruction given at the guilt phase.

 8. *The Court's Refusal to Give Defendant's Requested Instructions Regarding Mitigating Factors*

 The trial court refused a number of defendant's proposed instructions regarding mitigating factors. Defendant contends that the absence of proper instructions resulted in a failure to guide the jury's consideration of mitigating evidence as relevant to his personal culpability, thereby violating the Eighth and Fourteenth Amendments and analogous provisions in the California Constitution. (See *Penry* v. *Lynaugh* (1989) 492 U.S. 302, 317-328 [109 S.Ct. 2934, 2946-2952, 106 L.Ed.2d 256]; *People* v. *Frye, supra,* 18 Cal.4th at pp. 1015, 1022.) In evaluating defendant's contention, we consider the instructions and arguments as a whole to determine whether there is a reasonable likelihood that the jury applied the instructions in a manner that precluded the consideration of mitigating evidence. (*People* v. *Frye, supra,* 18 Cal.4th at p. 1021; *People* v. *Mincey* (1992) 2 Cal.4th 408, 472 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

 Section 190.3, factor (i) requires the jury to take into account, if relevant, "[t]he age of the defendant at the time of the crime." One of defendant's proposed instructions stated in relevant part: "Chronological age, by itself, is a matter over which the defendant has no control, and which is not relevant to the choice of penalty. [¶] However, the factor relating to 'defendant's age,' as set forth in these instructions, refers to any matter concerning defendant's age, maturity, and judgment which common experience or morality might indicate to be relevant to the issue of penalty. [¶] You shall therefore give any age-related factors and argument consideration in arriving at a judgment as to penalty." This instruction paraphrased the discussion of section 190.3, factor (i) in *People* v. *Lucky* (1988) 45 Cal.3d 259, 301-302 [247 Cal.Rptr. 1, 753 P.2d 1052], which rejected the defendant's argument that factor (i) could be considered only in mitigation. The opinion in *Lucky* states: "[T]he word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (45 Cal.3d at p. 302.) The trial court gave no reason for its refusal to give defendant's proposed instruction, and it gave no other instruction explaining section 190.3, factor (i).

██ Defendant contends that the court's refusal to give his requested instruction precluded the jury from considering his *mental* age as evidence in mitigation. Defense experts testified that defendant has an IQ between 67 and 72—within the mildly mentally retarded range—and a "mental age equivalent score" of 11 years. Without his requested instruction regarding age, defendant contends, no instruction specifically addressed the issues of his mental age or mental retardation, and the jury thus was precluded from giving the proper mitigating effect to this evidence. Defendant relies upon *Penry* v. *Lynaugh, supra,* 492 U.S. 302, 328 [109 S.Ct. 2934, 2951-2952], which held that the sentencing jury must be instructed that it can consider evidence of a defendant's mental retardation and background of abuse in determining whether to impose the death penalty. According to defendant, this requirement was particularly important in the present case because the prosecutor argued that defendant, who was 48 years of age at the time of the crimes, "is much less deserving of mercy than a young inexperienced defendant who has never experienced the consequences of his criminal acts."

*Penry* is distinguishable. In that case, the trial court was required to sentence the defendant to death if the jury answered yes to three questions: whether the defendant acted deliberately, whether there was a probability that he would pose a continuing threat to society, and whether the killing was an unreasonable response to provocation, if any. (*Penry* v. *Lynaugh, supra,* 492 U.S. at p. 310 [109 S.Ct. at p. 2942].) None of these questions permitted consideration of the defendant's retardation or background. In contrast, section 190.3, factors (d), (h), and (k) require consideration of whether the offense was committed while the defendant was under the influence of an extreme mental disturbance, whether the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, and any other circumstance that extenuates the gravity of the crime. The trial court's instruction that the jurors must consider these factors informed them that they were to consider evidence of defendant's mental retardation and mental age in deciding the appropriate penalty. (See *People* v. *Arias, supra,* 13 Cal.4th at p. 189 [section 190.3, factor (k) allows consideration of any mental condition]; *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1252 [14 Cal.Rptr.2d 702, 842 P.2d 1] [*Penry*'s requirement of supporting instructions is met by the section 190.3, factor (k) instruction].) Accordingly, there was no instructional error.[20]

---

[20]Defendant also relies upon *State* v. *Robinson* (1991) 330 N.C. 1 [409 S.E.2d 288, 305-308], which considered the effect of an erroneous instruction requiring the jury unanimously to find the existence of a mitigating factor before it could consider such a factor in determining the penalty. Because this error might have prevented consideration of evidence concerning the defendant's mental age, the appellate court, in deciding whether the error was

Moreover, the United States Supreme Court has held that section 190.3, factor (i) is not impermissibly vague simply because it can be either aggravating or mitigating: "Both the prosecution and the defense may present valid arguments as to the significance of the defendant's age in a particular case. Competing arguments by adversary parties bring perspective to a problem, and thus serve to promote a more reasoned decision, providing guidance as to a factor jurors most likely would discuss in any event. We find no constitutional deficiency in factor (i)." (*Tuilaepa* v. *California* (1994) 512 U.S. 967, 977 [114 S.Ct. 2630, 2637-2638, 129 L.Ed.2d 750].) In closing argument, defense counsel told the jurors that they should decide whether defendant's mental age falls within section 190.3, factor (i), and defense counsel also mentioned defendant's intelligence and mental retardation in connection with section 190.3, factors (d), (h), and (k). In light of this argument and the court's direction that the jury consider those three factors, we find no reasonable likelihood that the jury was misled to believe it could not consider the mitigating evidence regarding defendant's mental age and retardation.

Defendant next contends that the trial court erred in denying his request to exclude section 190.3 factors for which no evidence was introduced, and that the court should have identified which factors were mitigating and which were aggravating. The court instead instructed the jury, pursuant to defendant's request, that some factors would be inapplicable because they were not shown by the evidence, and that the jury was to disregard any factor not shown by the evidence; in addition, the jury was instructed that the absence of any mitigating factor could not be considered as an aggravating factor. We repeatedly have rejected the claims now made by defendant, and he provides no compelling reason for us to revisit them. (*People* v. *Frye, supra,* 18 Cal.4th at pp. 1026-1027; *People* v. *Ramos, supra,* 15 Cal.4th at p. 1183; *People* v. *Cox* (1991) 53 Cal.3d 618, 674-675 [280 Cal.Rptr. 692, 809 P.2d 351].)[21]

We also consistently have rejected defendant's claim that a trial court prejudicially errs in failing to instruct the jury sua sponte at the penalty

harmless, examined whether the jury *necessarily* considered such evidence in connection with other factors. The court simply held that the jury's finding with regard to a factor based upon the defendant's intoxication *or* mental condition did not establish that it necessarily considered his mental condition as a mitigating factor. Contrary to defendant's assertion, this decision does not hold that the jury specifically must be instructed to consider mental age as a separate mitigating circumstance.

[21]Contrary to defendant's assertion, *Delo* v. *Lashley* (1993) 507 U.S. 272, 277 [113 S.Ct. 1222, 1225, 122 L.Ed.2d 620], does not dictate a different result. *Delo* held that the trial court has no due process *obligation* to instruct on a mitigating circumstance where state law requires that such instructions be supported by some evidence. Nothing in the opinion suggests that a court may not instruct on mitigating factors in the absence of such evidence.

phase to disregard the no-sympathy instruction given at the guilt phase. (*People* v. *Frye*, *supra*, 18 Cal.4th at pp. 1024-1026.)

 Defendant contends that the trial court erroneously refused his instruction stating that mitigating factors are "unlimited." Although we have mentioned such an instruction with approval (e.g., *People* v. *Mayfield* (1997) 14 Cal.4th 668, 807 [60 Cal.Rptr.2d 1, 928 P.2d 485]), we also have stated that the catchall section 190.3, factor (k) instruction "allows the jury to consider a virtually unlimited range of mitigating circumstances." (*People* v. *McPeters* (1992) 2 Cal.4th 1148, 1192 [9 Cal.Rptr.2d 834, 832 P.2d 146].) The absence of defendant's proposed instruction thus was not reasonably likely to have misled the jury into believing that its consideration of mitigating circumstances somehow was limited.

Because we find no instructional error affecting the jury's consideration of mitigating factors, defendant's claim of heightened prejudice from cumulative instructional error is without merit.

### 9. *The Instruction on the Consequences of Reversal of a Death Sentence on Appeal*

During its deliberations at the penalty phase, the jury sent a note to the court stating: "If the death penalty is overthrown—would [defendant] get life or life without parole." The court had the jurors return to the courtroom, and asked the foreperson to elaborate upon the question. The foreperson responded: "What we were concerned with, that in the event that we found the defendant death [*sic*], that if it went to the higher court, if the death penalty was overthrown, would it be life in prison, or would it be just life with possibility of parole?" In a conference with the court in chambers, defense counsel requested that the jury be informed that defendant would be sentenced to life without the possibility of parole if a death sentence were overturned on appeal, and that he never would be released from prison. The court refused to give such an instruction, instead telling the jury: "I'm not going to answer your question as you put it . . . . [¶] You are not to speculate or be influenced in making your decision as to what may possibly happen or occur in the future as to any sentence that you impose. [¶] You are . . . to determine what you consider to be the proper penalty based upon consideration of all the evidence presented and the instructions given you by the Court. [¶] And it is to be made on the basis that your decision will stand."

Approximately 20 minutes later, the jurors sent a note to the court indicating that the jury was unable to arrive at a penalty verdict. The court

inquired how many jurors would wish to continue deliberations further if the court answered their previous question more fully. One juror responded affirmatively. The court then asked the foreperson whether answering the question more fully would be helpful. The foreperson replied: "It's a little more involved than that, your Honor. The people are dictating by their conscience, and it's hard to persuade somebody who is set on the decision." The court excused the jurors for lunch and asked them to consider whether they desired a further answer to their question. Upon resuming their deliberations, the foreperson sent a note to the court that stated: "Yes! We would like you to go over our last question[.] Higher court over rules [*sic*] death sentence?" The court then read the jurors the following instruction proposed by defense counsel but modified by the court: "First of all, you should vote on the assumption that your decision will not be overturned. However, if the Supreme Court should overturn or reverse the death penalty finding, the case would be sent back to the Court for a potential retrial of the penalty phase only. [¶] By the terms of your question, the conviction of guilt would stand. The District Attorney would have the option or decision as to whether to retry the penalty phase. [¶] If the district attorney chose not to retry the penalty phase, the penalty of life imprisonment without parole would stand. [¶] If the District Attorney chooses to retry the penalty phase, the new jury would decide on the penalty only; that is, of the death penalty or life imprisonment without parole." The court then reread to the jury its previous instruction that the jury was not to speculate or be influenced by what may happen in the future regarding any penalty it imposed, and that it should choose the penalty on the basis that its decision would stand. Two minutes after resuming deliberations, the jury informed the court that it had reached a verdict.

■ Defendant contends that the trial court's instruction did not eliminate the jury's confusion regarding the meaning of the term "life imprisonment without the possibility of parole." He contends the court should have granted defense counsel's request that the jury be informed that "under no circumstances could [defendant] get life with parole," and that defendant "would never get out" of prison. Defendant relies upon *Simmons* v. *South Carolina* (1994) 512 U.S. 154, 168-171 [114 S.Ct. 2187, 2196-2198, 129 L.Ed.2d 133], in which the high court held that when the prosecution urges a capital jury to sentence a defendant to death because of a potential for future dangerousness, the trial court cannot prevent the jury from learning that the defendant is not eligible for parole. Thus, when the jury in *Simmons* was required to choose between a death sentence and "life imprisonment," prohibiting the defendant from informing the jury that "life imprisonment" meant life in prison without the possibility of parole resulted in a violation of his right to due process of law. Defendant also asserts that the trial court's

failure to define the term "life imprisonment without the possibility of parole" precluded a reliable sentencing determination, in violation of the Eighth Amendment.

The prosecutor in the present case urged the jury to return a verdict of death, in part because of the potential that defendant would be dangerous in prison or to society if he escaped. Therefore, under *Simmons*, defendant was entitled to advise the jury that he was ineligible for parole. On several occasions, however, we have distinguished *Simmons* on the ground that under California's statutory scheme, the jury expressly is informed of the defendant's ineligibility for parole by the instruction that it must choose between death or "confinement in the state prison for life without the possibility of parole"; an instruction that such a sentence "will inexorably be carried out" would be incorrect. (*People* v. *Musselwhite, supra,* 17 Cal.4th 1216, 1271 [no error in refusing defense instruction that a sentence of life in prison without the possibility of parole meant that the defendant never would be paroled]; *People* v. *Holt, supra,* 15 Cal.4th 619, 687-689 [no sua sponte duty to give such an instruction]; *People* v. *Jones, supra,* 15 Cal.4th 119, 189-190 [no error in refusing a similar instruction requested by the defendant]; *People* v. *Osband* (1996) 13 Cal.4th 622, 715-716 [55 Cal.Rptr.2d 26, 919 P.2d 640] [same]; *People* v. *Arias, supra,* 13 Cal.4th 92, 172-173 [same]; *People* v. *Padilla, supra,* 11 Cal.4th 891, 971-972 [no sua sponte duty to instruct on the meaning of the term].)

Defendant contends that our post-*Simmons* decisions are inapposite because none considered a situation, like the one in the present case, in which the jury expressed confusion regarding the meaning of the term "life imprisonment without the possibility of parole." According to defendant, the court had a duty to eliminate the jurors' uncertainty by instructing that such a sentence signified that he never would be released from prison. As explained previously (pt. II.A.11., *ante*), the court has an obligation to rectify any confusion expressed by the jury regarding instructions, but has discretion to determine what additional explanations are sufficient to satisfy the jury's request for information. (§ 1138; *People* v. *Davis, supra,* 10 Cal.4th at p. 522.) In past cases we have rejected the claim that the term "life without the possibility of parole" confuses jurors or has a technical meaning that requires a sua sponte definitional instruction. (*People* v. *Ochoa, supra,* 19 Cal.4th at p. 457; *People* v. *Holt, supra,* 15 Cal.4th at pp. 688-689; *People* v. *Padilla, supra,* 11 Cal.4th at p. 971.) In the event the jury does express misunderstanding or concerns regarding the consequences of its choice of penalty, the court properly may address such confusion by instructing the jury to *assume* that whatever penalty it selects will be carried out. (*People* v. *Kipp, supra,* 18 Cal.4th at pp. 378-379.) The court did so in the present case

by instructing the jury it "should vote on the assumption that [its] decision will not be overturned," and "on the basis that [its] decision will stand." The court also correctly informed the jury regarding the consequences of a reversal of a death sentence on appeal, indicating that the most lenient penalty that could result after such a reversal would be life imprisonment without the possibility of parole. Indeed, the confusion reflected in the jury's note appears to concern the consequences of a reversal of a death sentence on appeal—not the meaning of life without the possibility of parole. In any event, it would have been error for the court to instruct the jury, as requested by defendant, that the penalty of life without the possibility of parole necessarily would be carried out and that defendant never would be released from prison. (*People* v. *Roybal* (1998) 19 Cal.4th 481, 524 [79 Cal.Rptr.2d 487, 966 P.2d 521]; *People* v. *Musselwhite, supra,* 17 Cal.4th at p. 1271.) We conclude that the court's instructions regarding the jury's sentencing alternatives were sufficient and correct, and that the instructions did not violate defendant's due process or Eighth Amendment rights.[22]

For similar reasons, we reject defendant's contention that the court erroneously refused his proposed instruction, described below, regarding other convicted murderers who became eligible for parole after their death sentences were reversed. Defendant observes that during voir dire, several jurors expressed concern regarding well-known murderers such as Sirhan Sirhan who now are eligible for parole after the death penalty statute under which they were convicted was held invalid. (See *People* v. *Sirhan* (1972) 7 Cal.3d 710, 717 [102 Cal.Rptr. 385, 497 P.2d 1121].) According to defendant, the trial court had a duty to instruct the jury that defendant was tried under a statute different from the one previously held unconstitutional, that the jury was to disregard previous cases, and that the jury could not speculate how the outcome of defendant's case might be affected by the subsequent actions of other authorities. As established above, however, the trial court did instruct the jurors not to speculate regarding events following the trial, and to assume that their penalty determination would stand. Any confusion the jurors may have had regarding a potential reversal of the penalty on appeal was addressed adequately by the court's explanation that the most lenient sentence possible after such a reversal would be life imprisonment without the possibility of parole. Defendant's requested instruction unnecessarily would have highlighted matters irrelevant to the jury's penalty determination.

---

[22]In light of our conclusion, we reject defendant's related arguments that the trial court's instruction was misleading because it invited speculation regarding the possible outcome of a retrial, and that his counsel was ineffective in failing to request an instruction informing the jury that a sentence of life without the possibility of parole meant that defendant would die in prison.

### 10. *The Court's Denial of Defendant's Motion for a Continuance*

The jury returned its penalty verdict on June 22, 1989. At the scheduled hearing on July 7, 1989, on the automatic motion for modification of the death penalty, defendant asked for a continuance, because defense counsel wanted to confer with cocounsel regarding a report he had received the preceding day from an investigator who had interviewed some of the jurors. The court granted the request and continued the hearing on the motion and sentencing to July 18. At the July 18 hearing, defendant orally requested another continuance to allow time to prepare and file a motion for new trial based in part upon juror misconduct. The investigation indicated that Juror No. 6 had reported that Juror No. 10 told several jurors during the guilt phase that Juror No. 10 had spoken with the judge about taking time off from work because the juror's coworkers had been asking her questions about the case. Juror No. 10 allegedly stated that the judge said the case already had cost $200,000, and that the judge did not want a mistrial to occur. Defendant requested a continuance to interview Juror No. 10 and other jurors regarding Juror No. 6's allegations, and also to ascertain whether Juror No. 6 would sign an affidavit repeating her allegations. The prosecutor opposed a continuance, noting among other things that defendant had not requested a continuance pursuant to section 1050, which requires at least two days' written notice. After stating that he never discussed the question of the cost of the trial with any juror, and that he saw no grounds for a new trial, the trial judge denied the request for a continuance.

Defendant contends that the trial court abused its discretion in failing to grant a continuance, that the court acted improperly by personally denying the allegation of ex parte contact with a juror and failing to assign the matter to an impartial judge, and that the court's action in this regard resulted in a deprivation of defendant's constitutional right to have competent counsel prepare and present a defense.

We find no error in the court's denial of the request for a continuance. As defendant acknowledges, section 1050, subdivision (b), requires that written notice of a motion for a continuance be filed and served at least two court days before the hearing. If the moving party does not comply with this notice requirement, the court must deny the motion unless, after a hearing, it finds there is good cause for the failure to comply and states on the record facts justifying its finding. (§ 1050, subd. (d); *People* v. *Jones, supra,* 17 Cal.4th 279, 318.) ▇ "A continuance will be granted for good cause (§ 1050, subd. (e)), and the trial court has broad discretion to grant or deny the request. [Citations.] In determining whether a denial was so arbitrary as to deny due process, the appellate court looks to the circumstances of each case

and to the reasons presented for the request. [Citations.] One factor to consider is whether a continuance would be useful. [Citation.]" (*People* v. *Frye, supra,* 18 Cal.4th 894, 1012-1013.)

Defendant makes no serious attempt to establish good cause for his failure to comply with the notice requirements of section 1050, subdivision (b). He states: "On July 18, 1989, defense counsel indicated for the first time, that they discovered there was improper contact between Juror No. 10 and the court." Defendant avers, in addition, that as soon as the defense team discovered this information, the court was informed. To the extent defendant suggests that defense counsel did not learn of Juror No. 6's allegations until the July 18 hearing, his suggestion is contradicted by the record. Even before the defense investigator interviewed any jurors, Juror No. 6 had reported her allegations directly to defense counsel. Defense counsel subsequently received the investigator's report on July 6—almost two weeks before the July 18 hearing. At the hearing on the motion to continue, defense counsel did not indicate that he just had discovered the information, but stated only that he *needed more time to investigate the allegations of misconduct.* Counsel offered no excuse for failing to provide two days' notice to the prosecution, nor did he provide an account of any investigation undertaken between July 7 and July 18 or explain why the jurors could not have been interviewed and affidavits prepared before the July 18 hearing. In the absence of any justification in the record for the failure to prepare a timely motion for a continuance or for new trial, we determine that the trial court did not abuse its discretion in denying a continuance. Nor did the trial judge err in ruling on the motion for a continuance instead of assigning the matter to another judge. Even if the judge had some obligation to disqualify himself from ruling on a *new trial* motion because he might have been a material witness regarding that motion (see Code Civ. Proc., § 170.1, subd. (a)(1)), he still properly could deny a *continuance* for failure to comply with applicable notice requirements.

Defendant contends, in the alternative, that defense counsel was ineffective in presenting the motion to continue, failing to seek disqualification of the trial judge, and failing to file a motion for new trial. Because the appellate record does not establish that, absent counsel's allegedly deficient performance, it is reasonably probable the trial court would have granted a motion for a continuance, we reject his claim of ineffective assistance of counsel based on that failure. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674]; *In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) We reject defendant's claims of ineffective assistance based upon counsel's failure to file motions for disqualification and a new trial, because the appellate record

does not establish that counsel performed deficiently by failing to make such motions, or that such motions likely would have been granted. (*People* v. *Mendoza Tello* (1997) 15 Cal.4th 264, 266-268 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

 11. *Claim That Defendant's Sentence Constitutes Cruel and Unusual Punishment*

 ▆▆ Defendant contends that the execution of mentally retarded individuals violates the Eighth Amendment's prohibition against cruel and unusual punishment, and that his sentence is unconstitutional on this ground. He acknowledges the United States Supreme Court has held that the execution of mentally retarded persons convicted of capital offenses is not categorically prohibited by the Eighth Amendment. (*Penry* v. *Lynaugh, supra,* 492 U.S. 302, 330-340 [109 S.Ct. 2934, 2952-2958].) Defendant observes that *Penry*'s holding, however, rested in part upon the court's determination that there was a lack of objective evidence indicating a national consensus against execution of the mentally retarded. The decision in *Penry* noted that only two states had enacted laws banning the execution of mentally retarded persons. Even adding those two states to the fourteen states that then had rejected capital punishment completely, the court found that an inadequate basis existed for a national consensus demonstrating the " 'evolving standards of decency that mark the progress of a maturing society,' " so as to compel the conclusion that executing mentally retarded offenders violates the Eighth Amendment. (*Id.* at pp. 330-331, 334 [109 S.Ct. at pp. 2952-2954, 2955].) By contrast, the high court has found objective evidence of a national consensus against capital punishment of a particular class of offenders when *no* state permitted execution of an insane person (*Ford* v. *Wainwright* (1986) 477 U.S. 399, 408-409 & fn. 2 [106 S.Ct. 2595, 2601-2602, 91 L.Ed.2d 335]), and when *none* of the 18 states specifying a minimum age in their death penalty statutes permitted execution of a defendant who was under the age of 16 years at the time of the crime (*Thompson* v. *Oklahoma* (1988) 487 U.S. 815, 829 & fn. 30 [108 S.Ct. 2687, 2695-2696, 101 L.Ed.2d 702]).

 Today at least 12 states have enacted laws banning execution of the mentally retarded.[23] In addition, Congress has specified that mentally retarded individuals are not subject to the death penalty in federal prosecutions. (18 U.S.C. § 3596(c).) Defendant claims that these legislative developments indicate a growing national opposition to the execution of mentally

---

[23]States that have enacted such laws are Arkansas, Colorado, Georgia, Indiana, Kansas, Kentucky, Maryland, Nebraska, New Mexico, New York, Tennessee, and Washington. (See *Rogers* v. *State* (Ind. 1998) 698 N.E.2d 1172, 1176, fn. 12 [citing statutes]; Neb. Rev. Stat. § 28-105.01, subds. (2) & (3).) Two of these states, Kansas and New York, had no death penalty at the time *Penry* was decided. (Bing, *Protecting the Mentally Retarded From Capital*

retarded persons, undermining *Penry*'s holding. It is unclear whether the incremental increase in the number of states with no death penalty or exemptions for mentally retarded individuals (from 16 states when *Penry* was decided, to 24 states today), together with the exemption under federal law, demonstrates a national consensus within the meaning of governing decisions, or whether the high court would overrule *Penry* in light of this circumstance. Our own Legislature has rejected a proposal to enact a law exempting mentally retarded defendants.[24] Very recent decisions of other states, some with and some without statutory prohibitions against execution of the mentally retarded, continue to hold that such executions do not violate the Eighth Amendment.[25]

We need not decide that issue in the present case, however, because the record does not establish that defendant falls within the class of mentally retarded individuals who would be exempt from the death penalty under the statutes of other states. Indiana law, for example, requires clear and convincing proof of both significantly subaverage intellectual functioning and substantial impairment of "adaptive behavior," which refers to how well an individual deals with the demands of everyday life compared with other individuals with similar educational and social backgrounds. Thus, an individual with an IQ of 69 to 72, chronic alcoholism and drug abuse, and possible brain disturbances, who nevertheless lived in the community, worked, operated an automobile, had social relationships with others, and could meet his own immediate needs, was found not to be mentally retarded within the meaning of the applicable statutory provision. (*Rogers v. State, supra*, 698 N.E.2d at pp. 1176-1180; see also *Rankin v. State* (1997) 329 Ark. 379 [948 S.W.2d 397, 402-404] [sustaining a trial court finding that the defendant was not mentally retarded where he had an IQ between 66 and 72 but was able to communicate, sustain relationships, and take care of his personal needs]; Ga. Code Ann. § 17-7-131, subds. (a)(3), (c)(3), (j)

---

*Punishment: State Efforts Since Penry and Recommended Actions for the Future* (1996) 22 N.Y.U. Rev. L. & Soc. Change 59, 120-121.)

[24](Assem. Bill No. 1455 (1993-1994 Reg. Sess.), passage rejected, Jan. 27, 1994, Assem. Final Hist. (1993-1994 Reg. Sess.) p. 1030.)

[25](*Rogers v. State, supra*, 698 N.E.2d at p. 1176 ["Although Indiana has chosen to exclude by statute the mentally retarded from the ranks of criminal defendants otherwise eligible for sentences of death . . . , *Penry* remains good law." (Fns. omitted.)]; *State v. Comeaux* (La. 1997) 699 So.2d 16, 25-27 [it is not unconstitutional to execute a defendant with an IQ of 68]; *Wells v. State* (Miss. 1997) 698 So.2d 497, 514-515 [a defendant with an IQ of 62 constitutionally may be sentenced to death]; *Hill v. State* (1998) 114 Nev. 169 [953 P.2d 1077, 1083-1084] [execution of a defendant with an IQ of 68 is not unconstitutional despite the "growing trend" of statutory exceptions for such individuals]; *State v. Holden* (1997) 346 N.C. 404 [488 S.E.2d 514, 533-534] [mentally retarded defendant with moderate organic brain damage constitutionally may be sentenced to death]; cf. *People v. Beeler* (1995) 9 Cal.4th 953, 995 [39 Cal.Rptr.2d 607, 891 P.2d 153] ["evidence of brain damage would not *necessarily* render the death penalty cruel or unusual" (original italics)].)

[requiring the trier of fact to find *beyond a reasonable doubt* "significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior" before a defendant may avoid execution on the ground of mental retardation].)

Defense experts testified that defendant has an IQ of approximately 70 and is mildly mentally retarded. His ability to interpret events around him and respond in appropriate ways is considerably below average. Defendant has extremely poor judgment and internal controls, with limited coping skills, and he needs external controls to function adequately in society. Defendant's school records indicate that when he was 13 years of age, a psychologist concluded he was mentally retarded and had a mental age of 7 years. On the other hand, the prosecution's expert attacked the reliability of the tests used by defense experts, and disagreed with the opinion that defendant is mentally retarded. The prosecutor also challenged the reliability of the conclusions reflected in defendant's school records. Moreover, although defendant has had obvious difficulty abiding by the law and functioning successfully in society, the evidence at trial, including his own testimony, indicated that he could communicate, take care of immediate personal needs, perform skilled labor, earn money, form friendships, drive and repair automobiles, and adapt well to living and working in prison. In ruling upon the automatic motion for modification of the penalty, the trial court stated that defendant's "low mentality" was being overly stressed: "[H]e's exhibited his ability to be a plumber, to be an electrician, to be a mechanic. He builds models that were presented here to the Court that were very well done. [¶] *So his mentality is not that of retardation.* He made a good witness on the stand and talked good [*sic*]. He didn't exhibit any of what we ordinarily consider signs of retardation. The fact that he was real good in prison . . . shows that he understands the rules and regulations. He can follow rules and regulations." (Italics added.) The court subsequently found that defendant had no mental disease or defect: "The I.Q. was low, but in all other aspects he [had] the ability to understand, not to do things and to conduct himself without any problem."

Viewing the conflicting evidence in the light most favorable to the judgment (*People* v. *Davis, supra,* 10 Cal.4th 463, 509), we determine that defendant is not mentally retarded within the meaning of other states' laws exempting mentally retarded individuals from the death penalty. Therefore, assuming, for the sake of argument only, that the Eighth Amendment precludes execution of the mentally retarded, it does not render defendant's sentence invalid.

 In a related argument, defendant contends that his sentence violates the proscription against cruel and unusual punishment in the Eighth Amendment and article I, section 17 of the California Constitution, because the

penalty imposed is grossly disproportionate to his individual culpability in light of the nature of the crime and his personal characteristics and background. (See *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697].) In evaluating such a claim, the standard is whether the punishment " 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*Id.* at p. 478; *People* v. *Ramos, supra,* 15 Cal.4th 1133, 1182.) Defendant relies upon evidence indicating that he committed the crime while intoxicated and suffering from organic brain damage and mental retardation, that he acted impulsively, and that he was impoverished and abused as a child. As explained previously, however, much of the evidence concerning defendant's mental defects and mental state was contradicted by evidence presented by the prosecution. Despite the mitigating evidence, the jury found that defendant possessed the specific intent required for the crimes of robbery and attempted rape, and that he killed a vulnerable victim by slitting her throat in three places in the course of committing those crimes. Ample evidence supports those findings. "Defendant's individual culpability thus places him well within the class of murderers for whom the Constitution . . . permit[s] a sentence of death." (*People* v. *Arias, supra,* 13 Cal.4th 92, 194; see also *People* v. *Beeler, supra,* 9 Cal.4th 953, 995; *People* v. *Thompson* (1990) 50 Cal.3d 134, 185-187 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Poggi* (1988) 45 Cal.3d 306, 348 [246 Cal.Rptr. 886, 753 P.2d 1082].)

Defendant further asserts that his death sentence violates the Eighth Amendment because the record does not support a finding that he intended to kill the victim or acted with reckless indifference to human life. He relies upon the principle that someone who is convicted of felony murder but did not actually kill, attempt to kill, or intend to kill, cannot be sentenced to death absent a showing of major participation in the underlying felony, combined with a culpable mental state consisting, at a minimum, of reckless indifference to human life. (*Tison* v. *Arizona* (1987) 481 U.S. 137, 150-157 [107 S.Ct. 1676, 1684-1688, 95 L.Ed.2d 127]; *Enmund* v. *Florida* (1982) 458 U.S. 782, 797-801 [102 S.Ct. 3368, 3376-3379, 73 L.Ed.2d 1140].) Evidence that the defendant is the actual killer and guilty of felony murder, however, establishes "a degree of culpability sufficient under the Eighth Amendment to permit defendant's execution." (*People* v. *Hayes* (1990) 52 Cal.3d 577, 632 [276 Cal.Rptr. 874, 802 P.2d 376]; *People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1037 [258 Cal.Rptr. 821, 773 P.2d 172].) The record in the present case contains abundant evidence that defendant actually killed and intended to kill. He admitted killing the victim by slitting her throat. As mentioned above, the prosecution presented evidence contradicting the testimony of defense witnesses suggesting that defendant's mental disorders

and intoxication caused him not to remember killing the victim and not to act intentionally. At sentencing, the trial court found defendant's testimony that he had amnesia not to be credible, and the court also rejected defendant's contention that mental disorders and/or intoxication rendered him incapable of conforming his conduct to the requirements of the law. Thus, assuming that the Eighth Amendment required proof of intent to kill or reckless indifference to human life before defendant could be sentenced to death for felony murder, that requirement has been satisfied in the present case.[26]

### 12. *Constitutionality of the California Death Penalty Statute*

Defendant contends that the California death penalty statute violates the Eighth Amendment because the special circumstances that determine death eligibility fail to "genuinely narrow" the class of murderers eligible for the death penalty. We repeatedly have rejected this argument, and do so again. (E.g., *People* v. *Frye, supra,* 18 Cal.4th at pp. 1028-1029; *People* v. *Musselwhite, supra,* 17 Cal.4th at pp. 1265-1266; *People* v. *Jones, supra,* 17 Cal.4th at p. 314.)

### 13. *The Cumulative Effect of Ineffective Assistance of Counsel and Prosecutorial Misconduct*

Defendant contends that he received ineffective assistance of counsel in connection with virtually every claim of error he has asserted on appeal, and that the cumulative effect of counsel's deficient performance deprived him of his right to a fair trial. As we have explained, however, in each instance either counsel's performance was not deficient, because there was no error, or defendant has failed to establish that he was prejudiced by any deficiency. Therefore, defendant's claim based upon the cumulative effect of ineffective assistance of counsel also must fail.

---

[26]Defendant contends in the alternative that the due process clauses of the federal and California Constitutions required a jury finding that he acted with reckless indifference to human life, before he could be considered eligible for the death penalty. This contention was asserted for the first time in a supplemental opening brief, without any supporting analysis, argument, or citation. Not until a supplemental reply brief was filed shortly before oral argument did defendant include a cursory analysis of his contention. "Obvious reasons of fairness militate against our considering this poorly developed and untimely argument. [Citations.]" (*Garcia* v. *McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10 [66 Cal.Rptr.2d 319, 940 P.2d 906]; see *People* v. *Barnett* (1998) 17 Cal.4th 1044, 1107, fn. 37 [74 Cal.Rptr.2d 121, 954 P.2d 384].) "[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. [Citations.]" (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 616, p. 648.) In any event, even when the Eighth Amendment requires proof of reckless indifference to human life, such proof may be presented, and the requisite finding made, *after* trial—at sentencing or on appeal. (*Hopkins* v. *Reeves* (1998) 524 U.S. 88, 98-99 [118 S.Ct. 1895, 1902, 141 L.Ed.2d 76, 87].) The United States Supreme Court has not suggested that due process of law requires more.

Defendant's claim of cumulative prejudice from prosecutorial misconduct similarly is without merit. In only one instance might the prosecutor have committed misconduct, and we have determined that defendant was not prejudiced thereby. (Pt. II.A.1., *ante.*)

### III. DISPOSITION

The judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—I concur generally in the opinion of the court and altogether in its judgment.

I write separately because, unlike my colleagues, I would resolve an issue of substantial importance to the jurisprudence of the death penalty in California and, indeed, in the United States as a whole.

Part of the Bill of Rights adopted in 1789, the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution, which was subsequently held applicable to the states through the due process clause of the Fourteenth Amendment, prohibits the infliction of penalties so described.

In *Penry* v. *Lynaugh* (1989) 492 U.S. 302 [109 S.Ct. 2934, 106 L.Ed.2d 256] (hereafter sometimes *Penry*), the United States Supreme Court explained the cruel and unusual punishments clause and its scope and interpretation. "At a minimum," it "prohibits punishment considered cruel and unusual" at common law "at the time the Bill of Rights was adopted." (*Id.* at p. 330 [109 S.Ct. at p. 2953].) But it is "not limited" thereto. (*Ibid.*) It "also recognizes the 'evolving standards of decency that mark the progress of a maturing society.'" (*Id.* at pp. 330-331 [109 S.Ct. at p. 2953], quoting *Trop* v. *Dulles* (1958) 356 U.S. 86, 101 [78 S.Ct. 590, 598, 2 L.Ed.2d 630] (plur. opn.).) "In discerning those 'evolving standards,'" courts "have looked," and indeed should look, to "objective evidence of how our society views a particular punishment today" for a particular class of persons. (*Penry* v. *Lynaugh, supra,* 492 U.S. at p. 331 [109 S.Ct. at p. 2953]; see *id.* at pp. 329-330 [109 S.Ct. at pp. 2952-2953]). "The clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." (*Id.* at p. 331 [109 S.Ct. at p. 2953].)

A decade ago, *Penry* held that the cruel and unusual punishments clause did not, at that time, prohibit execution of a sentence of death against mentally retarded persons. In doing so, it conceded that the federal constitutional provision might indeed impose such a bar as for some such persons,

namely, those "who are profoundly or severely retarded and wholly lacking the capacity to appreciate the wrongfulness of their actions"—who are generally excused from criminal responsibility in the first place through the defense of insanity. (*Penry* v. *Lynaugh, supra,* 492 U.S. at p. 333 [109 S.Ct. at p. 2954].) But it declined to go further. It was unable to discern that " 'evolving standards of decency' " had, in fact, evolved far enough to shield mentally retarded persons as such from the ultimate sanction. (*Id.* at pp. 330-331 [109 S.Ct. at p. 2953], quoting *Trop* v. *Dulles, supra,* 356 U.S. at p. 101 [78 S.Ct. at p. 598] (plur. opn.).) For, at that time, it could not discover the emergence of any "national consensus" on the point: In addition to a single federal statute, in the form of the Anti-Drug Abuse Act of 1988, then recently passed by Congress, which provided that "[a] sentence of death shall not be carried out upon a person who is mentally retarded" (21 U.S.C. § 848(*l*)), only two of the states that authorized the sentence of death—about 5 percent of the total—had enacted legislation that prohibited its execution against mentally retarded persons. (*Penry* v. *Lynaugh, supra,* 492 U.S. at pp. 333-334 [109 S.Ct. at pp. 2954-2955].)

Today, however, I would hold that the cruel and unusual punishments clause now prohibits execution of a sentence of death against mentally retarded persons. I am able to discern that, since *Penry,* "evolving standards of decency" have indeed evolved sufficiently in this area. Indeed, I cannot do otherwise. For I find that the requisite "national consensus" has, in fact, emerged. As I write, at least 11 of the states that authorize the sentence of death—about 29 percent of the total—have enacted legislation that prohibits its execution against mentally retarded persons. More important, however, is what Congress has done. In Congress, the representatives of the states speak for the nation as a whole. In the face of *Penry,* Congress has amended the Anti-Drug Abuse Act of 1988. It has not subjected the statutory provision cited above to repeal, but rather has caused it to be reenacted, to declare, now as originally, that "[a] sentence of death shall not be carried out upon a person who is mentally retarded" (21 U.S.C. § 848(*l*)). After *Penry,* it enacted the Violent Crime Control and Law Enforcement Act of 1994. In this statute, it expands authorization of the sentence of death. But, as in its earlier statute, it also prohibits its execution against mentally retarded persons, in identical terms: "A sentence of death shall not be carried out upon a person who is mentally retarded." (18 U.S.C. § 3596(c).) Whatever conditions or qualifications that may arguably be present in analogous state legislation are surely absent from the federal.[1]

Turning to the case at bar, I would not pass on the merits of Smithey's claim that the cruel and unusual punishments clause prohibits execution of

---

[1]The cruel or unusual punishment clause of section 17 of article I of the California Constitution prohibits the infliction of any penalty so described—which goes beyond punishment that is "cruel *and* unusual" under the Eighth Amendment to punishment that is "cruel *or*

the sentence of death on the ground that he is mentally retarded. Trial was conducted in the period prior to the decision in *Penry*—at a time, that is, before "evolving standards of decency" had evolved far enough, before the requisite "national consensus" had emerged. As a result, Smithey did not have an incentive or an opportunity to present the issue in terms that might prove adequate today. Neither did the People have an incentive or an opportunity to respond in similar terms. Now, each does.

I would therefore allow Smithey to raise his claim anew, via a petition for writ of habeas corpus, which is available to enforce prohibitions of a "fundamental . . . constitutional type" (*In re Harris* (1993) 5 Cal.4th 813, 828 [21 Cal.Rptr.2d 373, 855 P.2d 391]), including, of course, that of the Eighth Amendment against cruel and unusual punishments.

Appellant's petition for review by the Supreme Court was denied September 15, 1999, and the opinion was modified to read as printed above.

---

unusual." The state constitutional provision is broader than its federal constitutional counterpart. (E.g., *People* v. *Anderson* (1972) 6 Cal.3d 628, 634-639 [100 Cal.Rptr. 152, 493 P.2d 880].) Hence, it necessarily extends at least as far in its protection. That means that it, too, prohibits execution of a sentence of death against mentally retarded persons. That no similar statutory prohibition has yet been enacted by the Legislature does not undermine this conclusion. Just as the state constitutional provision cannot be trumped by legislative action (see *id.* at p. 640), neither can it be trumped by legislative *inaction*.